**ORTHO DIAGNOSTIC SYSTEMS, INC., Plaintiff,**

v.

**ABBOTT LABORATORIES, INC., Defendant.**

**No. 93 Civ. 2656(LAK).**

United States District Court, S.D. New York.

March 18, 1996.

As Corrected March 22, 1996.

1995, at C23. In fact, defendant's numbers err on the side of generosity to the plaintiff.

Robert M. Heller, Jonathan M. Wagner, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for Plaintiff.

Jeffrey I. Weinberger, Steven M. Perry, Henry Weissmann, Garth T. Vincent, Munger, Tolles & Olson, Los Angeles, Charles Carberry, Jonathan Lederman, Jones, Day, Reavis & Pogue, New York City, for Defendant.

## AMENDED OPINION

KAPLAN, District Judge.

This case reflects the competitive struggle between two powers in the sale of test products used in screening the blood supply for the presence of viruses. Defendant Abbott Laboratories, Inc. ("Abbott"), in the period at issue, was stronger than plaintiff Ortho Diagnostic Systems, Inc. ("Ortho"), a subsid-

iary of Johnson & Johnson in the sense that Abbott alone manufactured all five of the commonly used tests and its market shares generally were higher. The controversy involves Ortho's claim that Abbott violated the antitrust laws by entering into a contract with the Council of Community Blood Centers ("CCBC") pursuant to which CCBC members were entitled to advantageous pricing if they purchased a package of four or five tests from Abbott. Ortho contends that the pricing scheme improperly took advantage of Abbott's alleged monopoly position in some of the tests to foreclose or impair competition by Ortho in the sale of those tests available from both companies and violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and the Donnelly Act, N.Y.Gen.Bus.L. § 340 (McKinney 1988).[1] Not to be outdone in using litigation as a competitive weapon, Abbott has interposed counterclaims against Ortho, claiming that Ortho was guilty of unfair competitive practices in the procurement of the Red Cross contract and of involvement in an alleged theft of Abbott trade secrets. The matter is before the Court on motions by Abbott for summary judgment dismissing the claims against it and by Ortho for partial summary judgment dismissing Abbott's Lanham Act and tortious interference claims.

### Facts

#### The Products

The principal products involved in this dispute are five blood screening tests, or assays, that are used to test blood for the presence of viruses: (1) HBsAg tests for hepatitis B surface antigen; (2) HBc, also known as Anti–Core or Core, tests for the core of the hepatitis B virus; (3) HCV tests for the hepatitis C virus; (4) HTLV tests for a form of virus associated with leukemia; and (5) HIV–1/2 tests for two strains of the human immunodeficiency virus ("HIV"). The five assays each perform a unique function and thus are not interchangeable. It should be noted also that different manufacturers employ different technology, at least for certain of the assays. Abbott's is referred to as bead and Ortho's as microtiter technology.

The other product relevant to this case is data management systems ("DMS"). Blood tests are performed by blood donor centers, or BDCs, and plasma centers. Some collate and coordinate the test results manually. Others use a DMS, which consists of computer hardware and software, to perform that function.

#### The Customers

The users of these assays fall into three groups: BDC, plasma centers, and hospitals and laboratories.

BDCs collect whole blood from donors, each unit of which is subjected to all five assays. The largest BDC operator is the American Red Cross. A significant number of other BDC operators are members of the CCBC, which engages in joint purchasing activities on behalf of participating members. There also are some smaller, unaffiliated blood centers. The Red Cross and CCBC members, however, together collect 85 to 90 percent of the blood gathered by BDCs.

Plasma centers, unlike BDCs, collect blood plasma rather than whole blood.[2] As they process the plasma in ways thought to kill some viruses, they do not use the HTLV or Anti–Core assays.

Hospitals and laboratories test blood samples drawn from patients for diagnostic purposes. While they use the assays at issue here, they perform a far broader range of tests, both on blood and other bodily substances, and they are served by a distribution network entirely separate from that serving the BDCs and plasma centers. The parties have ignored them in briefing these motions, and the Court follows suit.

The parties disagree as to whether sales of assays to both BDCs and plasma centers are

---

1. Ortho's motion for a preliminary injunction, filed shortly after this action was filed, was denied by Judge Sand. *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.,* 822 F.Supp. 145 (S.D.N.Y.1993).

2. The principal constituents of whole blood are cells and plasma, a fluid in which the cells are suspended. The main cellular constituents are red blood corpuscles, white blood cells, and platelets, which are cell fragments. P. Weisz, The Science of Biology 501–10 (2d ed. 1959).

within the market, Ortho claiming that the sole relevant focus is sales to BDCs. As will become apparent, it is unnecessary to resolve this disagreement in order to dispose of these motions.

*The Competitors*

Abbott is an Illinois corporation having its principal place of business in Abbott Park, Illinois. In March 1993, Abbott was the only company that made all five of the blood assays here at issue, one of which—HCV—it made under license from Ortho. Moreover, according to Ortho, whose figures are accepted for purposes of this motion, Abbott then accounted for approximately 70 to 90 percent of the sales of all of the assays except HCV: [3]

| Test | Share to BDCs | | Combined Share to BDCs and Plasma Centers | |
| --- | --- | --- | --- | --- |
| | Units | Dollars | Units | Dollars |
| HTLV | 91% | 90% | same | same |
| HIV-½ | 86% | 87% | 77% | 81% |
| HBsAg | 75% | 73% | 69% | 67% |
| Anti-core | 70% | 69% | same | same |
| HCV | 21% | 20% | 35% | 33% |

In March 1993, Ortho offered HBsAg, Anti-core and HCV tests that were competitive with Abbott's. It made and sold an HTLV test as well, but claims that it then had not achieved widespread customer acceptance.

The two other competitors at the time were Organon–Technika and Genetic Systems, Inc. Both then sold HBsAg and HIV–1/2 tests, and Organon sold Anti-core as well.[4] According to Ortho, however, both Organon and Genetic Systems were insignificant competitive factors.

Abbott has developed a DMS which it offers to provide to its BDC and plasma center customers. Indeed, it sold one to the Red Cross some years ago. Ortho at the times relevant to this matter was in the process of trying to develop a competitive product.

*The CCBC Contract*

The CCBC seeks to negotiate advantageous purchasing terms for its members. In the fall of 1992, the CCBC submitted a request for proposal ("RFP") to both Abbott and Ortho for a three year contract to supply virology assays and data management systems to those of its members who wished to purchase them pursuant to such an arrangement. (PX [5] 31) The RFP stated in relevant part:

"You are requested to provide pricing for the following combinations:

"1. Price per test to supply all tests, exclusive of equipment and DMS. Quote pricing separately for equipment options and data management systems (DMS).

"2. Price per test to supply any two or three of the above viral marker tests as 'primary' plus ALT, and the other two as a 'secondary' supplier (see No. 9 below), exclusive of equipment and DMS. Quote pricing separately for equipment options and DMS.

"3. Price per test to supply all tests including basic equipment and DMS. Also provide monthly rental price of optional equipment relative to size of operation (i.e., annual collections).

"4. Price per test to supply any two or three of the above viral marker tests as 'primary' plus ALT, and the other two as a 'secondary' supplier (see No. 9 below), including basic equipment and DMS. Also provide monthly rental price of op-

---

3. Cpt. ¶¶ 15–16; Ortho Opp.Br. 14.

4. Organon obtained FDA approval for an HTLV test in late 1993.

5. "PX" refers to exhibits contained in the exhibit binders to Ortho's memorandum of law in opposition to Abbott's motion for summary judgment.

tional equipment relative to size of operation." (*Id.* at 1–2)

The RFP asked that the supplier guarantee access to its DMS "when equivalent tests are not provided by supplier" and "for equivalent test(s)." (*Id.* at 4) The RFP made it clear that CCBC proposed to sign a master contract covering the members listed on an attached schedule, but that the successful bidder would enter into separate contracts with participating members specifying delivery schedules and guaranteeing purchase volumes. (*Id.* at 2)

The record is filled with evidence concerning the negotiations that ensued between the CCBC and each of Abbott and Ortho, the competitors' proposals and revisions to them, and the alleged unhappiness of some CCBC members with the result. Ortho characterizes Abbott's attitude and actions pejoratively. Abbott reciprocates while defending its own positions as nothing more than tough competition. But there is nothing to be gained, at least at this stage, by intense focus on these matters. The fundamental issue at this point is the contract that resulted, and to that the Court now turns.

On March 29, 1993, Abbott and the CCBC executed a three year contract for the supply of blood screening tests and equipment. (PX 7) The salient features of the contract for purposes of Abbott's motion are the pricing structure and the provisions regarding DMS.[6] In addition, it is important to recognize that the CCBC master contract did not preclude the CCBC's members from entering into arrangements with Ortho, at least until they committed themselves to Abbott by individual contract. (Michels Dep. 246)

### Pricing

The CCBC contract contained four sets of test prices: those for members buying (1) all five assays from Abbott, which included also certain instruments and Abbott's DMS software; (2) four assays and Abbott's DMS; (3) four assays without Abbott's DMS; and (4) three or fewer tests. (PX 7, App. B) These are set forth in the following table.

| Test | Five Assays [7] (DMS included) | Four Assays (DMS included) | Four Assays (No DMS) | Three or fewer (No DMS) |
|---|---|---|---|---|
| HCV | $2.90 | $2.90 | $2.90 | $ 3.53 |
| Anti-core | .85 | 1.14 | 1.05 | 1.25 |
| HTLV | 1.03 | 1.18 | 1.09 | 1.57 |
| HIV–1/2 | 1.93 | 2.08 | 1.99 | 2.47 |
| HBsAg | .66 | .81 | .72 | 1.20 |
| Total | $7.37 | $8.11 | $7.75 | $10.02 |

Two aspects of the CCBC pricing are disputed. First, Ortho contends that the price schedule in the contract, as the contractual language states (PX 7, ¶ 3), established the prices that Abbott actually charges to CCBC members. It argues in particular that the prices in the "three or fewer" schedule are those that Abbott charges to CCBC members who do not buy four or five tests from Abbott. This is a point of special concern to Ortho, which bases its argument in no small part on the premise that the

6. Ortho complains also of the so-called technology bridge clause, paragraph 13, which provides in substance that CCBC members committed to buying Abbott's assays could switch to a "next generation" test developed by a competitor until sixty days after Abbott developed its own equivalent, that Abbott would offset the difference in price between Abbott's older test and the new competitive test for a period of six months, and that Abbott would provide microtiter equipment (if needed for use with the new test) at no extra charge.

Ortho, however, has made no serious effort to show that this provision violates the antitrust laws. In consequence, there is no need to address it further.

7. The contract provided five cent per test increments and decrements to the prices in the table for HCV and Anti-core for volumes less and greater, respectively, than set forth in an attached schedule.

excess of Abbott's unbundled prices for HTLV and HIV–1/2 over the package prices includes "penalties" for buying other tests from other suppliers. Unlike its position in the marketplace, Ortho's position on this motion allegedly is buttressed by the largest "penalties," i.e., the highest unbundled relative to bundled prices. Abbott, on the other hand, asserts that the contract established only maximum prices to CCBC members, as allegedly was well understood by CCBC, and that it reserved the right to negotiate lower prices to individual members. (MacPherson Dep. 250–52, 287–88; Bryant Decl. ¶ 19; see PX 32, at 5) Abbott has submitted unrebutted evidence that it actually sold assays to one purchaser of three or fewer Abbott tests, and offered them to some others, at prices below those in the CCBC contract. (Bryant Decl. ¶ 23–24) Nevertheless, viewing the evidence in the light most favorable to Ortho, the Court is bound to conclude for purposes of this motion that the CCBC "three or fewer" prices are those which Abbott actually charged to most of the participating CCBC members.

Second, Ortho contends that the CCBC contract in substance provided that Abbott's DMS would be available only to BDCs purchasing four or five test packages from Abbott. The contract itself does not so provide.[8] As will appear, however, there is sufficient evidence supporting Ortho's view that Abbott made its DMS available only to four and five test customers to require that Ortho's view be accepted for purposes of the motion.

*Competition Following the CCBC Contract*

Ortho maintains that the package pricing available to CCBC members gave Abbott a substantial advantage attributable to its alleged monopoly position in the HTLV and HIV–1/2 assays.

Immediately prior to the 1993 contract, Abbott accounted for 91 percent of HTLV and 77 or 86 percent of sales of HIV–1/2 sales, depending on whether sales to plasma centers are included. Since the BDCs needed all five products, the argument goes, these data demonstrate that "most felt that they had to buy at least these two from Abbott." (Ortho Opp.Br. 29–30) Ortho, however, was selling at least one of its tests to 55 percent of CCBC members. "[U]nder the new Abbott–CCBC agreement, a CCBC member wishing to purchase any of the other three tests [i.e., HBsAg, Anti-core and HCV] from Ortho," Ortho argues, "would be forced to pay Abbott a financial penalty on Abbott's other tests so severe that the option of buying assays from Ortho, was virtually illusory." (Id. at 30) Ortho illustrates its position by pointing out that a customer wishing to buy Abbott's HTLV, HIV–1/2 and HCV assays, but Ortho's HBsAg and Anti-core, would have to pay Abbott $7.57 for the three assays alone, while it could purchase all five from Abbott, together with DMS hardware and software and other equipment, for $7.37.

The evidence concerning what actually took place in the marketplace, at least on a gross level, is essentially undisputed, although the parties characterize it differently. Ortho responded to the Abbott–CCBC agreement by cutting its prices (See, e.g., Perry Decl. in support of Abbott's Mot., Ex. A; Skillman Dep. 24–25, Ex. 1 at K503457) and, in fact, kept all its prior CCBC member customers who had been buying two or more Ortho tests. (Yates Decl. Ex. B) It was considerably less successful with customers to whom it previously had sold only HCV, losing several such accounts. (Id.; Michels Dep. Ex. 13)

Abbott submits that the data confirm that Ortho largely has retained its pre-contract share of sales to CCBC members. According to computations submitted by Abbott, Ortho's estimated share of sales to CCBC members prior to the contract was 41.7 percent and thereafter fell to 39.5 percent. (Yates Decl. ¶ 7) While Ortho does not directly dispute this evidence, it makes two responses.

First, it points out that CCBC members had individual contracts with Ortho that did not all come up for renewal at the time the

---

8. Although Ortho does not manufacture all five assays, Ortho was able at the time of the CCBC bid and subsequently to arrange for provision of all five tests by working in conjunction with a complementary manufacturer. (Abbott Br. at 4, n. 1; Goldstein Dep. 607–08)

CCBC–Abbott contract was signed. Thus, by counting all Ortho sales to CCBC members, including sales to members who were not free to abandon Ortho until the later expiration of their contracts, Abbott, in Ortho's view, understates the decline in Ortho's success in winning business from CCBC members after the contract. According to Ortho, it is providing only ten percent of the total volume purchased by CCBC members whose business was at stake at the time of the CCBC agreement, not the forty percent Abbott estimates. (Ortho Opp.Br. 80) Putting aside the accuracy of Ortho's own estimate, its point concerning Abbott's estimate is well taken. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 501–02, 94 S.Ct. 1186, 1195–96, 39 L.Ed.2d 530 (1974) (product delivered to uncommitted customers better measure of current competitive strength than deliveries under preexisting long term contracts).

Second, Ortho maintains—again correctly—that Abbott's data do not take into account Ortho's lost opportunities. (Ortho Opp.Br. 80) Whatever Ortho's post-agreement share of sales to CCBC members, the comparison more appropriate to assessing the effect of the agreement on competition is between the actual post-agreement shares of Abbott's competitors and the shares those competitors would have had absent the agreement, not the competitors' pre-agreement shares. *Cf.* L.A. Kaplan, *Potential Competition and Section 7 of the Clayton Act*, 25 ANTITRUST BULL. 297, 314–17 (1980).

Taking this evidence in the light most favorable to Ortho and drawing all reasonable inferences in its favor, as is required on this motion, two conclusions clearly emerge. First, Ortho lost a significant volume of sales that it otherwise would have made to CCBC customers. Second, it retained some business of CCBC customers by making substantial price concessions.

The evidence concerning the effect of all of this on Ortho's profitability, which speaks also to the relationship between Abbott's pricing and Ortho's costs, is generally clear. Ortho's price cuts had an adverse effect on its profitability. But there is no allegation that Ortho's blood assay business—either its business in general or, more specifically, with CCBC members—was rendered unprofitable. To the contrary, the Rule 3(g) statements establish,[9] and other evidence[10] uniformly confirms, that Ortho's CCBC business remains profitable notwithstanding the price cutting. Indeed, it is clear that Ortho could have cut its HCV price substantially more than it did while still making a profit; one Ortho witness acknowledged that Ortho would make money on HCV at $1.75 per test (Goergen Dep. 105–06), and others noted that Ortho's cost of producing HCV is lower than Abbott's, as Abbott pays Ortho a per test royalty on that assay (Bryant Decl. ¶ 14 n. 2; Goldstein Dep. 402–03).

*The Red Cross Contract*

The Red Cross is the prize customer in the blood screening market, accounting for approximately half of all domestic purchases of blood screening tests by BDCs. (Amended Cpt. ¶ 14; PX 4 ¶ 12) Prior to 1994, Abbott supplied it with HTLV, HIV, HbsAg, and Anti-core, while Ortho supplied HCV. (Perry Aff. Ex. K)

In July 1993, the Red Cross began bidding for a new multi-year contract, to begin in 1994, for the supply of blood screening tests. To jump ahead of the story, Ortho won the contract. What is significant here, however, is a controversy about a means by which it allegedly did so.

The Red Cross' RFP stated that the Red Cross would require certain enhancements to

---

9.  Abbott's Rule 3(g) statement asserts that Ortho's CCBC contracts, as of the date of the filing of Abbott's motion, were profitable. (Abbott Statement Pursuant to Local Rule 3(g), ¶ 27) Ortho's response admits that its sales to CCBC customers "are generally profitable." It seeks to diminish the impact of that admission by contending that the majority of those customers as of the relevant date were not subject to Abbott's CCBC contract. (Ortho Statement Pursuant to Local Rule 3(g), ¶ 27) Nevertheless, Ortho does not contend that even those contracts into which it entered with CCBC members after the Abbott–CCBC contract became effective are unprofitable for Ortho.

10.  Michels Dep. 437, 544; Skillman Dep. 28; Ballish Dep. 75.

the assays during the term of the contract including "[a]n FDA licensed assay for the detection of antibodies to HTLV II in combination with detection of antibodies to HTLV I." (Weinberger Aff. Ex. E, § 4.12.1) It required each bidder to "indicate a target date for the delivery of each enhancement." (*Id.*)

Ortho and Abbott both submitted responses to the RFP on or about September 1, 1993. Ortho's response to the request for enhancements during the contract term stated that Ortho had applied to the FDA in August 1992 for approval of its new anti–HTLV–1 (rp21e enhanced) test ("HTLV rp21e") and that the date of "[a]nticipated licensure" was December 1993. (Weinberger Aff. Ex. F, § 4.12.1, App. at RC 1624–25.)

Abbott claims that Ortho's assertion in the bid proposal of September 1 that it expected HTLV rp21e to be licensed in December 1993, and its reiteration of that statement in a presentation on September 3, 1993 (Perry Aff. Ex. E, at 274–75), were misleading in that Ortho did not then have a good faith belief that the product would be licensed until significantly later. It contends that the statements were material and, indeed, that Abbott otherwise would have won the Red Cross contract.

### Discussion

### Ortho's Complaint

*The Section 2 Claims Relating to Blood Assays*

The amended complaint contains three claims for relief under Section 2 of the Sherman Act. The first asserts that Abbott had monopoly power in one or more of the alleged markets for HBsAg, Anti-core, HTLV and HIV–1/2 sold to BDCs and that the package pricing features of the CCBC contract unlawfully maintained that power. The second contends that Abbott had monopoly power in alleged markets for HIV–1/2, HTLV and DMS sold to BDCs and that its entry into the CCBC contract constituted monopoly leveraging—an effort to obtain a competitive advantage in markets for HBsAg, Anti-core and HCV by use of its power in HIV–1/2, HTLV and DMS. The third alleges that Abbott's actions constituted an attempt to monopolize a market said to consist of sales of each of the five assays bought by BDCs. The Court deals here with the claims of abuse of power over blood assays. The Section 2 claims involving DMS relate to alleged tying and are dealt with below.

All of Ortho's blood assay Section 2 claims have a common theme—Ortho's insistence that the package pricing in the contract improperly uses Abbott's alleged dominance in markets for some of the five assays to gain an inappropriate advantage over Ortho in the other assays. Abbott responds that it lacked monopoly power, or a dangerous probability of acquiring it, in any relevant market. But its response follows two other lines as well. First, it maintains that its pricing to the CCBC in all cases was above its average variable cost and, in consequence, that its pricing was both legitimate and desirable competition that resulted in lower prices and increased consumer welfare. In any case, however, it contends that Ortho has failed to demonstrate any tangible harm to competition.

### Market Power

At the outset, the Court declines Abbott's invitation to grant summary judgment on the ground that Abbott lacks market power in any relevant assay market.

Abbott's share of the alleged market for HTLV was at least 90 percent. It accounted for at least 77 percent of HIV–1/2 sales and for 67 to 75 percent of both HBsAg and Anti-core. Although perhaps never dispositive of the existence of market power, a sufficiently high market share has been the most important factor since even before Judge Learned Hand's famous statement that 90 percent of supply "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir.1945). Indeed, the cases are crystal clear that market shares in the ranges enjoyed by Abbott give rise to an inference of market power, as evidenced recently by the Supreme Court's holding in

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) (80% to 95% share gives rise to inference of market power sufficient to defeat summary judgment). *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (87% share gives rise to inference of market power); *International Boxing Club v. United States*, 358 U.S. 242, 249, 79 S.Ct. 245, 249, 3 L.Ed.2d 270 (1959) (93% share); *American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (⅔ of market). The theoretical basis for this presumptive reliance on market share, moreover, is well known. *See, e.g.,* W. Landes & R. Posner, *Market Power in Antitrust Cases*, 94 HARV. L.REV. 937, 944–46 (1981) (*"Market Power"*).

■ Abbott responds, correctly, that a determination of the existence of market power—the power to raise prices or exclude competition—requires also consideration of the special characteristics of the market, which may prevent even a firm with a large share from abusing its position. *See, e.g., International Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *Market Power*, 94 HARV. L.REV. at 947–51. And it contends that Ortho's capture of the Red Cross contract, which was projected to erode Abbott's market shares substantially,[11] demonstrates its lack of market power. But its position is insufficient to overcome the inference of mar-

ket power that the Court is bound to draw, for summary judgment purposes, from its market shares.

To begin with, Abbott does not contend that the Red Cross contract or any other events have eroded its 90 percent-plus share of the HIV–1/2 market. In consequence, even if the evidence to which it points were sufficient to establish its lack of market power in the other assay markets, the inference of market power in HIV–1/2 would stand.

■ Second, assuming *arguendo* that Abbott did lose share as a result of the Red Cross contract, the loss of share is no more than some evidence tending to negate the existence of market power. It is not inconsistent as a matter of law, at least on this record, with the possession of market power. *See, e.g., American Tobacco Co.*, 328 U.S. at 795, 66 S.Ct. at 1132 (monopolization found despite decline in share from 90.7% to 68%); *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 970 (10th Cir.) (upholding finding of monopoly power despite decline in market share), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366–67 (9th Cir.1988) (same); *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 496 n. 18 (9th Cir.1977) ("declining market share may reflect an absence of market power ... but it does not foreclose a finding of such power"), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).[12] More-

11. According to Abbott, Abbott's post-Red Cross contract shares of markets consisting of purchases by BDCs (the view of the market definition most favorable to Ortho) would be as follows: HCV—30.6%, HTLV—46.5%, HBsAg—37%, and Anti-core—34.3%. (Wistar Decl. ¶ 6)

12. Abbott relies on *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832 (2d Cir. 1980), and *Caldwell v. Am. Basketball Ass'n*, 825 F.Supp. 558 (S.D.N.Y.1993), *aff'd without consideration of the point*, 66 F.3d 523 (2d Cir.1995), for the proposition that the decline in Abbott's market share projected to result from Ortho's capture of the Red Cross contract requires, as a matter of law, the conclusion that Abbott lacks market power in any of the assay markets. The argument is unpersuasive.

*Nifty Foods* held that a plaintiff claiming attempted monopolization failed to raise a genu-

ine issue of material fact as to a defendant's alleged probability of successful monopolization where it relied solely upon the defendant's market share, which had declined from 54.5 to 33 percent in the years immediately following the conduct complained of. The case does not control here because Abbott does not even contend that the Red Cross contract would reduce its share of the HIV–1/2 market below its 90 percent-plus level. Moreover, the *Nifty Foods* court dealt with a five year history of actual market performance whereas Abbott asks this Court to dismiss Ortho's case on the basis of a projection as to the likely future effect of the Red Cross contract. *Caldwell* is less supportive of Abbott's position because Judge Sand there held only that the American Basketball Association could not be regarded as having held monopoly power in the market for professional basketball players' services in

over, there is other evidence suggesting the existence of market power, notably the small number of competitors despite apparently high profit margins and the high barriers to entry posed by the need for FDA approval of tests and the other requisites of effective competition in such a scientifically demanding business. In all the circumstances, the question whether Abbott possessed market power in the relevant assay markets raises a genuine issue of fact.

## The Pricing Standard

■ The elements of Ortho's Section 2 theories vary. In order to establish monopolization, the plaintiff must prove that the defendant possessed monopoly power (i.e., the power to control prices or exclude competition) and wilfully acquired, maintained or used that power rather than growing as a consequence of a superior product, business acumen or historical accident. *E.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985); *United States v. Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Attempted monopolization requires that the defendant establish (1) a specific intent to control prices or destroy competition in the relevant market, (2) predatory or anticompetitive conduct intended to achieve that object, and (3) a dangerous probability of success in achieving a monopoly. *E.g., Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 454, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993); *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1017 (2d Cir.1989); *Volvo North America Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 73–74 (2d Cir.1988). Finally, in *Berkey Photo,* the Second Circuit

held that "a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market"—this is the offense of monopoly leveraging.[13] 603 F.2d at 275. Nevertheless, all three offenses require predatory or anticompetitive conduct or an inappropriate use of monopoly power by the defendant. If Abbott is correct in contending that its CCBC pricing was legitimately competitive, all three charges fail.

Unfortunately, the *Grinnell* test is not of much assistance in resolving particular cases. Every competitor seeks to capture as much business as possible. If *Grinnell* condemns all such behavior by actual and threatened monopolists, it would condemn the proverbial inventor of the better mousetrap as well as the storied trusts of the nineteenth century. Courts therefore have been engaged for years in a case-by-case process of distinguishing between conduct that reflects a "purpose or intent to exercise [market] power," *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948), and that which reflects no more than aggressive competition on the merits, competition that properly may utilize the advantages of size, but that may not employ the power derived from a dominant position in the market. *Berkey,* 603 F.2d at 274.

Pricing is an exceptionally sensitive area in this process. Price cutting is a classic, and a socially desirable, form of competition. Lower prices typically make more goods available to more people and thus result in greater overall benefits to society. Price cutting may result also in some competitors being driven out of business, a result that is tolerated as a natural product of legitimate competition where an exit is the product of an inability to compete efficiently on the merits. On the other hand, price cutting can be used by a

---

view of its collapse two years after the conduct in question. While both cases support reference to post-conduct events in the marketplace, as well as market shares, in determining the existence of market power, both are fact specific and neither is dispositive of the issue at bar.

**13.** *Berkey*'s leveraging theory has been rejected by the Ninth Circuit. *Alaska Airlines, Inc. v.*

*United Airlines, Inc.,* 948 F.2d 536, 548 (9th Cir.1991). Other courts have reserved judgment. *See, e.g., Advanced Health–Care Serv. v. Radford Comm. Hosp.,* 910 F.2d 139, 149 n. 17 (4th Cir.1990); *Ass'n for Intercollegiate Athletics for Women v. NCAA,* 735 F.2d 577, 586 n. 14 (D.C.Cir.1984). This Court, however, is bound by *Berkey.*

dominant firm with superior staying power to drive its competitors out of business with the intention thereafter of using its market power to restrict output, raise prices, and recoup the losses sustained in the competitive battle and then to enjoy the fruits of monopoly profits in the future. As price cutting thus offers, on the one hand, great benefit while threatening, on the other, great harm, care must be exercised to avoid judicial actions that penalize or threaten to penalize beneficial price cutting in an unduly zealous effort to punish less desirable forms. "[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 234 (1st Cir.1983).

■ Judicial efforts to draw the line between these two situations initially were not very sophisticated. *Cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220–21, 113 S.Ct. 2578, 2586–87, 125 L.Ed.2d 168 (1993); III PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW ¶ 711a, at 150–51 (1978) ("ANTITRUST LAW"). In 1975, however, Professors Areeda and Turner published a seminal article that argued that pricing should not be condemned as predatory and, implicitly, that it should not be regarded as an abuse of market power, unless the prices at issue are below the defendant's average variable cost. P. Areeda & D. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV.L.REV. 697 (1975) ("*Predatory Pricing*"). The article, it fairly may be said, revolutionized the judicial approach to the analysis of pricing behavior and ultimately led to the Supreme Court's holding that "a plaintiff seeking to establish competitive injury from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *Brooke Group*, 509 U.S. at 222, 113 S.Ct. at 2587. It is clear also in this Circuit that the "appropriate measure" of a rival's costs generally is average variable cost, although the Supreme Court has yet to make such a determination and other circuits are not in uniform agreement. *Compare Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 88 (2d Cir.1981) *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), *with Brooke Group*, 509 U.S. at 223 n. 1, 113 S.Ct. at 2587 n. 1.

■ Here, Ortho concedes that the Abbott prices set forth in the CCBC contract exceed Abbott's average variable cost. But this case differs in a vital respect from *Brooke Group, Northeastern Telephone Co.*, and all save one of the previous pricing cases—the pricing at issue here involves the bundled pricing of a package of complementary products, in some of which the defendant has market power, as well as the unbundled prices of the components of the package. In consequence, it is important to focus on the rationale of the Areeda–Turner test in order to assess whether and how the average variable cost standard applies in these circumstances.

There is general consensus that the sacrifice of current profits in the expectation that the losses will be recouped by higher prices after the competition is driven from the marketplace is a necessary, albeit not a sufficient, condition of predation. *Predatory Pricing*, 88 HARV.L.REV. at 698, 703; *see Brooke Group*, 509 U.S. at 223–24, 113 S.Ct. at 2588; L.A. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 113 (1977). What separates the competitive sheep from the anticompetitive goats, however, is the sacrifice of current profits in consequence of pricing below an appropriate measure of the defendant's cost. The reason is plain: below-cost pricing, unlike pricing at or above that level, carries with it the threat that the party so engaged will drive equally efficient competitors out of business, thus setting the stage for recoupment at the expense of consumers. III ANTITRUST LAW ¶¶ 714–15; *see also* J.A. Ordover & R.D. Willig, *An Economic Definition of Predation: Pricing and Product Innovation*, 91 YALE L.J. 8, 13 (1981) ("*Predation*"). The average variable cost standard proposed by Areeda and Turner and adopted by so many courts thus is a vehicle designed to identify cases in which the defendant has priced its product at a level that creates the risk of depriving consumers of the benefits of competition from firms at least as efficient as

the defendant. As the Second Circuit wrote in *Northeastern Telephone Co.*,

> "Adopting marginal cost as the proper test of predatory pricing is consistent with the pro-competitive thrust of the Sherman Act. When the price of a dominant firm's product equals the product's marginal costs, 'only less efficient firms will suffer larger losses per unit of output; more efficient firms will be losing less or even operating profitably.' Areeda & Turner, *supra*, 88 Harv.L.Rev. at 711. Marginal cost pricing thus fosters competition on the basis of relative efficiency. Establishing a pricing floor above marginal cost would encourage underutilization of productive resources and would provide a price 'umbrella' under which less efficient firms could hide from the stresses and storms of competition." 651 F.2d at 87 (footnote omitted).

The question, therefore, is whether a firm that enjoys a monopoly on one or more of a group of complementary products, but which faces competition on others, can price all of its products above average variable cost and yet still drive an equally efficient competitor out of the market.

The answer to this question seems to be that it can, thereby casting into doubt reliance on the Areeda–Turner formula in package pricing cases where a party has market power over one of the components of the package. A hypothetical example illustrates the point. Assume for the sake of simplicity that the case involved the sale of two hair products, shampoo and conditioner, the latter made only by A and the former by both A and B. Assume as well that both must be used to wash one's hair. Assume further that A's average variable cost for conditioner is $2.50, that its average variable cost for shampoo is $1.50, and that B's average variable cost for shampoo is $1.25. B therefore is the more efficient producer of shampoo. Finally, assume that A prices conditioner and shampoo at $5 and $3, respectively, if bought separately but at $3 and $2.25 if bought as part of a package. Absent the package pricing, A's price for both products is $8. B therefore must price its shampoo at or below $3 in order to compete effectively with A, given that the customer will be paying A $5 for conditioner irrespective of which shampoo supplier it chooses. With the package pricing, the customer can purchase both products from A for $5.25, a price above the sum of A's average variable cost for both products. In order for B to compete, however, it must persuade the customer to buy B's shampoo while purchasing its conditioner from A for $5. In order to do that, B cannot charge more than $0.25 for shampoo, as the customer otherwise will find A's package cheaper than buying conditioner from A and shampoo from B. On these assumptions, A would force B out of the shampoo market, notwithstanding that B is the more efficient producer of shampoo, without pricing either of A's products below average variable cost.[14]

This analysis disposes of Abbott's contention that it is entitled to dismissal of the Section 2 claims because it is not even accused of pricing below average variable cost. While average variable cost is the controlling standard in this Circuit in single product cases, *Northeastern Telephone* and *Brooke Group* did not even address package pricing such as that involved here and thus cannot have decided the issue.[15] For present pur-

---

**14.** The authors of ANTITRUST LAW argue that package pricing is not predatory as long as the price of the package exceeds the relevant cost of the package. *Id.* ¶ 1758f, at 352. The analysis leading to this conclusion, however, presupposes that the defendant lacks market power in any of the products comprising the package. Rivals, they reason, cannot be heard to complain; they simply will be driven to offer similar packages or discount their own tying product prices. *Id.* & n. 52. Where, as here, the defendant has market power in the tying product, this alternative is not a realistic option and this analysis seems inapt.

**15.** In arguing for a fully distributed rather than an average variable cost standard, the plaintiff in *Northeastern Telephone* did rely on the fact that the defendant was a multi-product firm. But its contention was that the defendant "would subsidize its losses with profits earned in other areas of its business" and this warranted a test of predation more stringent than average variable cost. 651 F.2d at 88–89. This does not resolve whether a test other than average variable cost is appropriate for determining whether the pricing of a package of products is predatory.

poses, the controlling point is this: The average variable cost standard serves only one purpose—distinguishing in single product situations (a) pricing that constitutes competition on the merits from (b) pricing that may permit a monopolist or putative monopolist to get rid of its competitors and pave the way for an abuse of market power. The standard, if applied in the manner that Abbott advocates, would not necessarily perform that function in a situation like this one. In consequence, the fact that the components of Abbott's package all are priced at or above average variable cost is not alone fatal to Ortho's Section 2 claims.[16]

This analysis finds support in *SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089 (E.D.Pa.1976), *aff'd*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). The case involved the cephalosporin family of antibiotics. Lilly introduced the first cephalosporin, Keflin, in 1964 and later followed with Keflax. In the early 1970s, the two Lilly products accounted for over 80 percent of the market.[17] In 1973, SmithKline introduced its own cephalosporin called Ancef. Lilly responded by (a) introducing a generic equivalent of Ancef, called Kefzol, and (b) offering customers a three percent rebate if they purchased all three of the Lilly products. Thus, Lilly took advantage of the popularity of Keflin and Keflax to gain an advantage in selling Kefzol against SmithKline's Ancef. In order for SmithKline to sell Ancef to a customer that needed all three drugs—and to do so at a price that left the customer in the same economic position as if it had bought all three drugs from Lilly—SmithKline had to do two things. First, it had to match Lilly's three percent discount on Kefzol, the product directly competitive to Ancef. But it also had to price

Ancef sufficiently lower than Kefzol to offset the customer's loss of the three percent discount on its purchases of Keflax and Keflin.

The District Court held, after trial, that Lilly's rebate plan violated Section 2 of the Sherman Act because "by linking its most powerful cephalosporin products, Keflin and Keflax, to its unpatented product, Kefzol, [it] unlawfully used its monopoly power to foreclose competition in and to exclude competition from the cephalosporin market." 427 F.Supp. at 1129. And it specifically rejected an argument similar to that which Abbott makes here:

"[A] monopolist does not receive immunity merely because it has priced the product in issue above its average cost. For that immunity is lost when it uses a pricing scheme linking the monopolistic products (Keflin and Keflax) with another competitive product (Kefzol) to deter SmithKline from entering or effectively competing in the cephalosporin market. We should be ever mindful that the gravamen of this complaint and my holding are not that the price Lilly separately charges for Keflin or Keflex are unreasonable from an antitrust standpoint; the nub of this case is the linkage of these latter products in a pricing scheme to deter competition in Kefzol....

"Lilly's game plan of today, whereby it uses its monopolistic power in one product (Keflin) as a lever for a packaging scheme with other Lilly products, does not escape violating the rules of the antitrust game simply because the defendant sets the price of each of its products above their average cost." *Id.* at 1128.

The Third Circuit affirmed, holding that Lilly improperly associated its "legal monop-

---

16. The parties have expended a good deal of energy in debating whether Ortho's claim is properly characterized as one of predatory pricing. As indicated above, Ortho must adduce evidence sufficient to ground a conclusion that the pricing should be condemned, whatever adjective may be applied. In the Court's view, the standard discussed in the text—pricing that could drive a more efficient competitor from the marketplace—is that which separates legitimate from illegitimate competition. Whether such behavior is characterized as "predatory" is quite beside the point. If it transgresses that standard, it satis-

fies the conduct element of monopolization, attempted monopolization and leveraging and will be unlawful if the other elements of those claims are met.

17. Although Keflin and Keflax were patented, all of the cephalosporins were interchangeable for some uses. The patents themselves, as frequently is the case, did not confer market power. The *SmithKline* courts regarded the market as including the entire family of cephalosporins.

olistic practices"—its pricing of Keflex and Keflin—"with an illegal activity that directly affected the price, supply and demand of Kefzol and Ancef" that otherwise "would have been determined by the economic laws of a competitive market." 575 F.2d at 1065. *See also Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1203 (3d Cir.1995).

Abbott's responses to *SmithKline* are unpersuasive. True, the case was decided before the Areeda–Turner test swept the boards. But Areeda–Turner is not the litmus in the narrow circumstances of this case that it has become in deciding single product predation claims for the reasons given above. True, Keflex and Keflin were patented, whereas Abbott's HIV–1/2 and HTLV are not. But the *SmithKline* courts relied on Lilly's dominance of the overall cephalosporin market evidenced by its eighty percent-plus market share rather than on the patents in and of themselves. *See* 427 F.Supp. at 1106, 1121, 1129; 575 F.2d at 1065 (affirming the district court's finding that Lilly's control of 100% to 89.8% of the cephalosporin market during a ten year period was monopolistic, "notwithstanding that its position in the market was originally the result of patents"). True, Abbott's package discount has not driven Ortho out of the market. But it would be senseless to hold that a plaintiff victimized by an antitrust violation may not seek judicial relief as long as it remains in business.

█ While the fact that Abbott has priced each component of its package above average variable cost is not alone sufficient to protect it from Section 2 liability, there remains Abbott's contention, variously phrased, that there can be no liability here because Ortho's blood assay business—indeed, its blood assay business with CCBC members—remains profitable.

As noted above, Ortho does not allege in its amended complaint, or otherwise assert, that its own sales to CCBC members since the Abbott–CCBC contract are unprofitable. Its failure to dispute Abbott's contention, in Abbott's 3(g) statement, that all of its CCBC sales are profitable conclusively establishes the point for purposes of this motion.[18] All of the other evidence of record on the motion supports that view. In consequence, however deep its price cuts, Abbott not only has priced its products above Abbott's average variable costs, it has priced them above Ortho's costs as well.

█ This fact is highly significant. As discussed above, only price cutting that threatens equally or more efficient firms is condemned under Section 2. In consequence, this Court holds that a Section 2 plaintiff in a case like this—a case in which a monopolist (1) faces competition on only part of a complementary group of products, (2) offers the products both as a package and individually, and (3) effectively forces its competitors to absorb the differential between the bundled and unbundled prices of the product in which the monopolist has market power—must allege and prove either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce.[19] Any other rule would entail too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price com-

---

18. The failure to controvert Abbott's Rule 3(g) statement assertion that Ortho's sales to CCBC members are profitable requires that Abbott's assertion be deemed admitted. S.D.N.Y. Civ.R. 3(g); *accord, e.g., DiCola v. SwissRe Holding (North America), Inc.,* 996 F.2d 30, 31 (2d Cir.1993); *Maresco v. Evans Chemetics, Div. of W.R. Grace Co.,* 964 F.2d 106, 111 (2d Cir. 1992); *Gatling v. Atl. Richfield Co.,* 577 F.2d 185, 187–88 (2d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 169 (1978); *May Dept. Stores Co. v. International Leasing Corp.,* No. 88 Civ. 4300 (CSH), 1995 WL 656986, *3 (S.D.N.Y. Nov. 8, 1995); *Feltner v. D & H Impact Mktg., Inc.,* No. 92 Civ. 4334 (DLC), 1995 WL 476701, *1 (S.D.N.Y. Aug. 10, 1995); *Noonan, Astley & Pearce, Inc. v. Insurance Co. of North America,* No. 92 Civ. 2824 (SAS), 1994 WL 114823, *5 (S.D.N.Y. Mar. 31, 1994); *Naantaanbuu v. Abernathy,* 816 F.Supp. 218, 222 (S.D.N.Y.1993); *Seward & Kissel v. Smith Wilson Co.,* 814 F.Supp. 370, 376 (S.D.N.Y. 1993).

19. These requirements of course are in addition to any others required by law. *See, e.g., Brooke Group,* 509 U.S. at —, 113 S.Ct. at 2589 (plaintiff must establish likelihood of recoupment).

petition that would afford substantial benefits to consumers. As the Second Circuit has written:

> "The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business." *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir.1979) (citation omitted)

Ortho concedes that Abbott's prices are above its average variable costs. It concedes, and in any case does not claim otherwise, that Abbott's package leaves Ortho able to sell its products at a profit, albeit not as large a profit as previously.[20] It nevertheless argues that Abbott's pricing, in the circumstances of this case, violated Section 2 of the Sherman Act.

Ortho places principal reliance upon the deposition testimony of Janusz A. Ordover, an economist and co-author of *Predation,* 91 YALE L.J. 8. Ordover's analysis compares the price to consumers and the loss to the manufacturer of the five assay package with the three assay package. Specifically, he inquires whether the pricing in the five assay package is such that incremental net revenue from selling the two additional tests is greater than the revenue forgone as a result of the price cuts of the original three tests. If so, he regards the pricing of the package as "compensatory" and appropriate; if not, he regards it as a Section 2 violation because offering the five assay package "cost" Abbott money as compared with offering its products at the three or fewer prices. (Ordover Dep. *passim; see also* Tr. 35–37). According to Ordover, the figures here are "indicative of failure of the compensatory pricing test." (Ordover Dep. 130) [21]

Abbott invites the Court to reject Ordover's compensatory pricing theory as a matter of law, but there is no need to do decide that question. Ordover, for whatever reason, evidently was not asked to undertake a comprehensive analysis of Abbott's pricing. He produced no report or affidavit, and he acknowledged in his deposition that he had not completed his analysis. (*Id.* 110–11) Moreover, the observations in his deposition do not deal with a consideration that appears to have an important bearing on his compensatory pricing theory.

Ordover's testimony assumes that the effect of the package pricing was simply to reduce the revenues generated by sales of HTLV and HIV–1/2 by an amount equal to the difference in the bundled and unbundled prices of those assays, and he treats that difference as a cost of the sales of the other assays. But the package pricing structure Abbott adopted cut the prices of all five assays. As demand for a firm's products ordinarily is a function of price—lower prices generally mean greater demand—Abbott's CCBC pricing reasonably may be expected to have increased its unit sales of all of the assays and thereby to have generated added profits offsetting, at least in part, the revenue loss attributable to the price cuts. Ordover's deposition testimony does not confront this matter with any specificity. In consequence, it is impossible to determine from the evidence submitted by Ortho whether a rigorous application of Ordover's compensatory pricing theory would yield the conclusion that Abbott's pricing fell within or without the bounds of Section 2 as Ordover views them. Indeed, Ordover himself carefully hedged his testimony by saying the pattern was "indicative" of a failure to meet his proposed standard as distinguished from opining that the standard was not satisfied.

---

**20.** *See* notes 9–10 *supra.*

**21.** More specifically, he stated that Abbott priced HCV and Anti-core together at $3.75 in the five assay package, which exceeded Abbott's combined marginal cost of $1.49 for those two products by $2.26. He then reasoned that Abbott had to forgo $1.62 in the added revenue it presumably would have obtained from sales of HIV, HTLV and HBsAg had it sold those assays at the higher, unbun-

dled prices. Treating that presumptively forgone revenue as a cost of selling the HCV and Anti-core at the bundled prices would reduce the nominal profit on HCV and Anti-core to $0.64. (Ordover Dep. 95–147) Even this profit is said to disappear when the costs of providing Abbott's DMS to five assay buyers are taking into consideration. (*Id.* 112–22, 132–47)

■ In order to defeat a properly supported motion for summary judgment, a party may not rest on economic theories that may or may not apply to the facts of the case or on conclusory or incomplete expert analyses any more than it may rest on unsubstantiated allegations of its pleadings. *See, e.g., Advo, Inc.,* 51 F.3d at 1198–99 (affirming summary judgment dismissing predatory pricing claim despite expert affidavit); *Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir.1989); W.W. SCHWARZER ET AL., THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS 52–57 (1991). Accordingly, the compensatory pricing argument is insufficient to defeat this motion, and Abbott is entitled to summary judgment dismissing all of Ortho's Section 2 claims relating to the pricing of its blood assays. On this record, the Court can conclude only that Abbott's pricing under the CCBC contract was legitimately competitive.

## The Tying and Exclusive Dealing Claims

Ortho's fourth claim for relief alleges that the CCBC contract constitutes an unlawful tying and exclusive dealing arrangement in violation of Sections 1 of the Sherman Act, 15 U.S.C. § 1, and 3 of the Clayton Act, 15 U.S.C. § 14.[22] The essence of the claim is that the CCBC contract effectively ties those assays in which Abbott lacks market power to either or both (a) the HTLV and HIV–1/2 assays, and (b) Abbott's DMS. In addition, the second and third claims for relief assert that the alleged tie of blood assays to Abbott's DMS violated Section 2 of the Sherman Act because it constituted leveraging of Abbott's alleged monopoly position in DMS or an attempt to monopolize certain blood assay markets.

### Assays

■ An indispensable element of an unlawful tying arrangement is the seller's conditioning of the availability of product A on the purchase of product B. *E.g., Eastman Kodak Co.,* 504 U.S. at 495, 112 S.Ct. at 2097; *Northern Pacific Ry. v. United States,* 356 U.S. 1, 6 n. 4, 78 S.Ct. 514, 518 n. 4, 2 L.Ed.2d 545 (1958). Thus, if the tying product may be purchased without also buying the allegedly tied product, there can be no unlawful tying. *Northern Pacific Ry.,* 356 U.S. at 6 n. 4, 78 S.Ct. at 518 n. 4. Here, Abbott manifestly does not condition the sale of HIV–1/2 or HTLV on the customer's purchase of other assays from Abbott. Rather, Ortho's claim is that the pricing structure in the CCBC contract implicitly ties these products. But the fact that the products are sold as part of a package at a discount price is not alone sufficient to establish the requisite tie-in. *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 11–12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984); *Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221, 235 (S.D.N.Y. 1988); X ANTITRUST LAW ¶¶ 1758a *et seq.* Ortho may prevail only if it establishes, in addition to the other elements of a tying violation, that Abbott's pricing structure makes purchase of the tying and tied products together the only viable economic option.[23] *United States v. Loew's, Inc.,* 371 U.S. 38, 52, 54–55, 83 S.Ct. 97, 105, 106–07, 9 L.Ed.2d 11 (1962); *Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1500 (8th Cir.1992), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993); *Shop & Save Food Markets, Inc. v. Pneumo Corp.,* 683 F.2d 27, 30–31 (2d Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993, 1002 & n. 3a (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975); DATA GENERAL ANTITRUST LITIGATION, 1986 TRADE CAS. (CCH), ¶ 67, 254 (N.D.Calif.1986); *Nobel Scientific Indus. Inc. v. Beckman Instruments, Inc.,* 670 F.Supp. 1313, 1325 (D.Md.1986), *aff'd.* 831 F.2d 537 (4th

---

22. The standard under the two statutes is identical. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 23 n. 39, 104 S.Ct. 1551, 1564 n. 39, 80 L.Ed.2d 2 (1984).

23. Professor Areeda has argued that this standard is "too extreme." X ANTITRUST LAW ¶ 1758b, at 345–46. He nevertheless urged caution in finding a tie on the basis of package pricing and proposed a presumption that there is no tie where "separate sales," *i.e.,* sales outside the package, equal or exceed ten percent. *Id.* As Ortho has offered no evidence to suggest that this condition is not satisfied here, there is no need to address the legal standard in this case.

Cir.1987), *cert. denied,* 487 U.S. 1226, 108 S.Ct. 2886, 101 L.Ed.2d 920 (1988); *Ways & Means, Inc. v. IVAC Corp.,* 506 F.Supp. 697, 701 (N.D.Calif.1979), *aff'd,* 638 F.2d 143 (9th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 210 (1981).

■ Here, the evidence demonstrates beyond reasonable dispute that the unbundled prices of HIV and HTLV–1/2 are not so high as to make their purchase as part of the package the only viable alternative. Undisputed evidence establishes that Abbott received more than $9.5 million (more than 17 percent of its 1993 blood screening sales) from sales of HIV–1/2 and HTLV that were made at prices *above* the respective $2.47 and $1.58 prices for those tests to "three or fewer" customers per the CCBC contract. (Bryant Decl. ¶ 20) This empirical evidence alone shows that the purchase of HIV–1/2 and HTLV assays from Abbott at the unbundled prices was not economically prohibitive.[24] *See, e.g., Amerinet,* 972 F.2d at 1501 (affirming summary judgment where evidence showed customers "could realistically have purchased" the tying product separately); *Shop & Save Food Markets, Inc.,* 683 F.2d at 31; *Ways & Means, Inc.,* 506 F.Supp. at 702. Accordingly, Abbott is entitled to summary judgment dismissing this tying and exclusive dealing claim.[25]

### DMS

■ Ortho claims that Abbott tied the sale of blood assays to sales of its DMS by refusing to provide its DMS to "three or fewer" CCBC members. Abbott contends that this claim should be dismissed because Abbott made its DMS available separately, because Abbott lacked market power in a market for data management systems, and in any case because there is no evidence that any customers were coerced into purchasing unwanted blood assays.[26]

### Separate Availability

Abbott argues that its DMS was separately available to CCBC members. (Bryant Decl. ¶¶ 36–39) The bulk of the evidence relied upon by Ortho to the contrary (cited at Ortho Opp.Mem. 98–100) suggests only that Abbott resisted the inclusion of a DMS option for "three or fewer" customers in the CCBC contract, which is a proposition quite different from conditioning its sale on the purchase of at least four assays. Mr. Albee of Lifeblood, however, testified that he was told by an Abbott representative that the DMS was not available to "three or fewer" customers and produced contemporaneous notes corroborating his testimony. (Albee Dep. 50–52, 68; PX 89) Another BDC, Central Indiana Regional, understood that the DMS was "not available at any price" if it purchased fewer than four assays. (Buchner Tr. 64; PX 52 at 3) This evidence is sufficient to raise a triable issue of fact as to whether Abbott made its DMS available separately.

### Coercion

■ Abbott's argument that there is no evidence of coercion fails for substantially the same reason as Abbott's contention that the products were separately available.[27] As at

---

24. The price the Red Cross agreed to pay Abbott in 1994 for HIV further reinforces the conclusion that the $2.47 unbundled price in the CCBC contract was not so high as effectively to force CCBC members to take the package.

25. It is worth noting too that Ortho's tying claim sounds especially hollow. The combined unbundled price of Abbott's HIV–1/2 and HTLV is $4.04. As its package price for all five tests is $7.37, Ortho could sell its three competitive assays competitively with the Abbott package at a combined price of $3.33, which admittedly is above its cost. Hence, Ortho in substance seeks relief under the antitrust laws for business lost as a result of its own refusal to lower its prices sufficiently to meet the competition.

26. Tying may violate Section 2 of the Sherman Act as well as Section 1 of the Sherman Act and Section 3 of the Clayton Act if the defendant has either the requisite power in the market for the tying product or a dangerous probability of acquiring market power in the market for the tied product. IX ANTITRUST LAW ¶ 1702, at 31. Accordingly, the analysis of the alleged DMS tie-in is the same under all three statutes except that (1) the monopoly leveraging claim requires a higher level of market power than the Section 1 and Clayton Act claims and (2) the determination whether Abbott had a dangerous probability of success in monopolizing the markets for the tied products, the assays, is unique to the Section 2 claims.

27. Coercion is an essential element of a tying claim in this circuit. *See, e.g., Suburban Propane v. Proctor,* 953 F.2d 780, 789 (2d Cir. 1992).

least two BDCs understood that the Abbott DMS, which was important to their purchasing decisions, simply was unavailable to "three or fewer" customers, the issue of coercion cannot be decided as a matter of law.

*Market Power*

Abbott next points to *Jefferson Parish Hospital District No. 2,* and its progeny, which stand for the proposition that a tying defendant may be liable under Sherman Act § 1 and Clayton Act § 3 only if it has market power in the market for the tying product, here DMS, and that a market share above 30 percent is necessary to establish the requisite power. *See, e.g.,* I ABA Antitrust Section, Antitrust Law Developments 150–51 (3d ed. 1992) The Section 2 leveraging claim, for reasons previously expressed, is not viable absent proof of a substantially greater market share. *Id.* at 212–14.

Abbott maintains that its DMS market share is only 15 percent, an estimate arrived at by determining the quotient of (1) the number of assays sold that depend on Abbott-controlled DMS for data management and (2) the total number of assays performed by BDCs and plasma centers. Ortho counters this argument by accusing Abbott of gerrymandering the market share data. It objects to the inclusion of plasma centers in the analysis and to the fact that the Red Cross, which purchased an Abbott DMS some years ago, is included in the denominator but not the numerator of Abbott's market share fraction.

Abbott is not, generally speaking, in the computer hardware and software business. It provides its DMS to certain of its customers and furnishes them with upgrades, no doubt out of a desire to promote good customer relations and to encourage the use of Abbott assays. In the case of the Red Cross, however, it sold a DMS, which the Red Cross has modified and continues to use. Abbott argues that Abbott can no more influence the Red Cross by withholding its DMS than it could if the Red Cross had bought a system from someone else or developed its own. It therefore contends that the Red Cross' testing volume is part of the universe of all tests performed, but should be excluded in determining the share of the DMS market attributable to Abbott. Ortho, on the other hand, suggests that the fact that the Red Cross uses an Abbott DMS is evidence of Abbott's domination of the alleged DMS market and therefore should be included in both parts of the fraction. The Court concludes that both are right to a degree.

Tying arrangements evoke two antitrust concerns:

"They deny competitors free access to the market for the tied produce, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products." *Northern Pacific Ry.,* 356 U.S. at 6, 78 S.Ct. at 518.

Thus, proper analysis of alleged tying arrangements requires their consideration from the perspectives of both competitors and customers.

From the competitors' point of view, Abbott's analysis of the market is correct. From their perspective, the issue is the extent to which Abbott's DMS forecloses competing sellers of blood assays from selling their products. The relevant universe (the denominator) is the total of all blood assays performed, which includes assays performed not only by the Red Cross, but by plasma centers as well. The extent to which Abbott's DMS forecloses Abbott's blood assay competitors from selling their products is measured by the number of assays performed by customers who are dependent upon Abbott to provide its DMS. As the Red Cross no longer is so dependent, the assays it performs are not properly included in the numerator. Hence, viewed from this perspective, Abbott's share of the relevant market is well under 30 percent.

The situation, however, is different from the consumers' point of view. The concern of a consumer is with the range of DMS suppliers to whom that consumer realistically can turn if it decides that it needs a DMS to run its business. In this context, market share is used not to measure the extent of vertical foreclosure of Abbott's competitors, but as an indicator of how important Abbott is as a

provider of such systems. For this purpose, one cannot properly disregard the Red Cross' system, as it was provided by Abbott. Similarly, when the issue is Abbott's power in the alleged DMS market, the relevant focus is not the total number of blood assays performed or, for that matter, the total number of assays performed the data from which are processed by DMS. Rather, the appropriate inquiry is the proportion of all DMS accounted for by Abbott, which might be measured against systems recently supplied or perhaps even the total installed base of such systems.

The data relevant to this inquiry is incomplete. Of the 52 BDC members, 35 have Abbott DMS; 31 use them for test data and four only as file servers. (Ortho Ex. 22, at A0000165; Bryant Decl.Ex. E n. 2) Apart from the Red Cross, however, the record does not reveal how many other BDC orplasma centers there are, how many use DMS or, of those that do use DMS, the number that use Abbott's. Hence, it is impossible to determine Abbott's share from the consumer viewpoint.[28] There is, however, anecdotal evidence. Broadly speaking, and viewing the record in the light most favorable to Ortho, the evidence shows that some BDCs collate and manage their test data manually. A few use one or another gerryrigged system or products provided by other suppliers. But Abbott's DMS is widely regarded as the only effective and reliable system available.

It is Abbott's burden on this motion to establish that there is no genuine issue of material fact as to its lack of market power, whether measured against the 30 percent Section 1–Section 3 standard or the much higher level required on the monopoly leveraging claim. While the anecdotal evidence probably would be inadequate to overcome a properly supported motion, Abbott's failure to provide evidence demonstrating quantitatively its alleged lack of market power from the perspectives of both competitors and consumers requires that Ortho receive the benefit of the doubt. Abbott's market power argument therefore fails.

Accordingly, Abbott's motion for summary judgment dismissing the claim that it tied the purchase of blood assays to the availability of its DMS in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act is denied.[29]

### Donnelly Act Claim

Ortho's fifth cause of action is a claim under the Donnelly Act. N.Y.Gen.Bus.Law § 340 (McKinney 1988). As the Donnelly Act is coextensive with the Sherman Act, defendant is entitled to summary judgment dismissing the Donnelly Act claims corresponding to the dismissed federal antitrust claims. See Venture Technology, Inc. v. National Fuel Gas Co., 685 F.2d 41, 42 n. 1 (2d Cir.), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982).

### Abbott's Counterclaims

Ortho moves for summary judgment dismissing Abbott's first two causes of action, which assert that Ortho obtained the Red Cross contract by means of a false representation to the Red Cross and thus by violating 15 U.S.C. § 1125(a) and intentionally interfering with Abbott's prospective economic advantage.

As noted above, the crux of Abbott's claim is the contention that Ortho misled the Red Cross by telling it in early September 1993 that it expected FDA approval of its new HTLV rp21e test by the end of that year

---

**28.** Even if the market were limited to CCBC members who use DMS, Abbott's precise share would be indeterminate because the record does not disclose non-Abbott DMS use by those CCBC members who use a different system. The range necessarily would be between 59.6 or 67.3 percent, at the low end, depending upon whether the four CCBC members who use the Abbott DMS only as a file server are included, and 100 percent at the high end, as Abbott would account for 31 to 35 systems out of a universe no larger than 52 and as small as 31 or 35. This, however, would be an unduly restrictive view of the market because it would ignore DMS use by non-CCBC members.

**29.** Abbott has not attacked Ortho's claim that it attempted to monopolize assay markets by tying assays to the availability of DMS except on the grounds that DMS was separately available and that there was no coercion. Given the Court's finding of genuine issues of fact on those points, the motion for summary judgment dismissing this attempted monopolization claim must be denied.

when, according to Abbott, Ortho did not then have a good faith belief that the FDA would act so quickly and, indeed, believed approval would not be forthcoming until late 1994.

Ortho's statement appeared in its response to Section 4.12.1 of the Red Cross' RFP, which sought enhancements during the term of the contract. It appeared just after Ortho's statement that "It is difficult to predict dates of licensure for assays under FDA review. Based on our experience, we present assumptions for expected licensure dates." (Weinberger Aff.Ex. F, § 4.12.1, at RC1624) Moreover, just two weeks later, on September 14, 1993, Ortho's Dr. Thomas O'Brien wrote to Dr. Roger Dodd, head of the Red Cross Transmissible Disease Laboratory and a member of the team evaluating the bids (Kloak Dep. 16–17) and indicated that Ortho expected the HTLV rp21e assay to be approved by the FDA "late this year or early in 1994." (Weinberger Aff.Ex. H) Hence, the Red Cross was told at the outset that the December 1993 date that followed was no more than an assumption.[30]

> Section 43(a) of the Lanham Act provides, in pertinent part:
>
> "Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading misrepresentation of fact which .... in commercial advertising or promotion misrepresents the nature, characteristics, [or] qualities ... of his or her ... goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such an act. 15 U.S.C. § 1125(a) (West Supp.1995) (as amended 1988 and 1992)."

■ In order to establish its Lanham Act claim, Abbott must prove, among other things, that (1) Ortho made a false or misleading statement and (2) the deception was material to the purchaser's decision. *See, e.g., Taquino v. Teledyne Monarch Rubber,*

893 F.2d 1488 (5th Cir.1990); *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 117 (E.D.N.Y.1993). The parties dispute whether the record as to these two elements entitles Ortho to summary judgment.

■ Ortho contends, first, that there was no false or misleading statement because Ortho communicated to the Red Cross the information that Abbott claims was concealed and otherwise misleading. Ortho relies on the qualifications, noted above, that the December 1993 date was an assumption and that such assumptions are uncertain things. However, the evidence presented by Abbott raises a genuine issue as to whether Ortho knew that the December 1993 or early 1994 assumptions it communicated to the Red Cross had no basis in fact. Without unduly prolonging this opinion, it suffices to note, by way of example, that Ortho knew in September 1993 that one of the FDA prerequisites to test licensure was the applicant's access to an FDA-licenced manufacturing facility. (Perry Aff.Ex. G, at 31–32) Ortho intended to meet this requirement through an arrangement with Cambridge Biotech Corporation, which was to manufacture the HTLV rp21e test for it. But by September 1993 Ortho did not know if Cambridge had applied for an FDA license for its manufacturing facility. (*Id.* Ex. I, at 18–19, 27–28) A trier of fact might reasonably conclude from this evidence that Ortho had no reasonable basis for its September 1993 statement to the Red Cross about the projected licensing date for HTLV rp21e.

Ortho's more vigorous challenge to the misrepresentation counterclaim is the contention that the assumed licensing date for HTLV rp21e was not material in that it did not influence the Red Cross' decision. Ortho offers extensive evidence to support this point. For example, Ms. Frederick, a member of the Red Cross evaluation team, testified that the HTLV rp21e "wasn't an issue that ... significantly concerned us" and "wasn't an outstanding issue in our negotia-

---

**30.** To be sure, a statement that a bidder "assumes" that X will occur by a date certain can be fraudulent if the bidder in fact does not so assume. The fact that the Red Cross was alerted in express terms to the fact that the December 1993 date was an assumption bears, however, on the materiality of the statement and on the issues of reliance and causation.

tions or discussions." (Frederick Dep. 213) She added that she didn't "recall that the dates ... for licensure of [HTLV rp21e] were even an issue in our decision-making process." (*Id.* at 45–46) Mr. Kloak, another evaluation team member, said that it was immaterial which of the competing bidder's enhanced HTLV tests was licensed first and that no member of the team thought that "if Ortho's expectation as the date of the FDA licensure of [HTLV] rp21e was incorrect, then [the Red Cross] shouldn't buy four assays from Ortho." (Kloak Dep. at 179)

This testimony is not surprising in view of the Red Cross' sophistication with respect to the FDA approval process. Its officials were well aware of the uncertainty inherent in attempting to predict its timing or outcome and thus took any vendor assumptions and predictions with more than a proverbial grain of salt. Mr. Kloak acknowledged that "FDA approval of anything is unpredictable." (*Id.* at 111) Ms. Frederick said that she knew "that you cannot predict FDA licensure dates" and that everyone in the industry knows that "[t]here is no way to validate when a test is going to be FDA licensed." (Frederick Dep. at 233–34) In consequence, she made it perfectly clear that she simply does not accept vendor license estimates, assuming that "oftentimes they put the best light on telling us when an assay will be ready." (*Id.* at 41–42)

The improbability that the Red Cross depended on the accuracy of the license date is suggested too by the contract, which provided that the Red Cross could switch to Abbott's enhanced HTLV test if it were licensed before Ortho's. (Weinberger Aff.Ex. L, § 4.20.5 & Ex. F, § 4.20.5, at RC1316LL; Frederick Dep. at 185) In fact, the Red Cross eventually did seek the HTLV test from Abbott. (Perry Aff.Ex. F at 413–15; Abbott Opp.Br. at 13)

Abbott's response to this evidence is twofold. It relies on *Gillette Co. v. Wilkinson Sword, Inc.,* No. 89 Civ 3586 (KMW), 1992 WL 30938, 1992 U.S.Dist. LEXIS 1265 (S.D.N.Y. Jan. 31, 1992), for the proposition that it is entitled to "a powerful inference" that the Red Cross relied on the assumed licensed date and was deceived because of

evidence that Ortho engaged in deliberate deception. Second, it contends that a genuine issue of fact remains as to the materiality of the alleged misrepresentation even without the inference.

The *Gillette* point is easily laid to rest. *Gillette,* to be sure, said that a false advertising plaintiff may recover damages if it establishes "either empirical evidence of actual deception or evidence of the defendant's intention to deceive with false representations." *Id.* 1992 WL 30938, at *1, at *3. This reflects the law in this circuit, which holds that proof of deliberately deceptive conduct requires the defendant to negate the inference of confusion, effectively shifting the burden of proof to the defendant. *Resource Developers, Inc. v. The Statue of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 140 (2d Cir.1991); *see also PPX Enterprises, Inc.,* 818 F.2d 266, 271 (2d Cir.1987). But the proposition should not be extended beyond its rationale.

The inference discussed in *Gillette* and *Resource Developers* arose in cases in which the alleged misrepresentation was made in advertising disseminated widely to the public. In such cases, it is difficult to prove directly the effect of the advertising on consumers. Rather than allow the proponent of false advertising to escape liability because proof is difficult, courts have relied on inferential proof such as consumer survey evidence, *see, e.g., PPX Enterprises, Inc.,* 818 F.2d at 271, and accepted that it is fair to shift the burden to the defendant to prove that its effort to deceive the public was not successful, *Resource Developers,* 926 F.2d at 140.

Here there is no practical difficulty in determining what if any significance the alleged misrepresentation had on the purchaser. The alleged misrepresentation was made to a Red Cross evaluation team, whose members have been deposed about the import of the alleged misrepresentation. There is no justification for substituting an inference created to deal with a different problem for the direct evidence of the state of mind of the Red Cross team.

Since Abbott is not entitled to an inference that the alleged misrepresentation was mate-

rial, it must counter Ortho's strong showing that the alleged misrepresentation did not affect the Red Cross' decision. Abbott for purposes of this motion, however, need only present evidence that, if believed, would be sufficient to support a jury finding of materiality to the Red Cross purchase decision. Abbott has carried this burden.

Abbott attempts to discount the deposition testimony of Red Cross witnesses by focusing on its timing. Abbott contends that the depositions, which were taken in December 1993, before the Red Cross witnesses were aware of substantial slippage in projected licensure date, do not show that Red Cross was willing to accept a licensure date as late as December 1994, Ortho's alleged internal estimate. It relies also on an ambiguous answer in Ms. Frederick's deposition: When asked if she believed Red Cross obtained the best package even if the test is not licensed until July 1994, she responded "I don't know." (Frederick Tr. 200)

Standing alone, Abbott's arguments would be unavailing. Ms. Frederick's answer at most shows that, upon greater reflection, Ms. Frederick was unsure at her deposition whether a July 1994 licensure date would have made another deal more attractive. It does not contradict the testimony by Ms. Frederick and other members of Red Cross that the FDA approval date was not a significant issue in the negotiations or in the purchase decision. Nor does speculation that the witnesses might have testified differently if they had been examined more recently substitute for proof of causation. See, e.g., Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309, 1313 (3d Cir.1975) (while the jury was free to disregard defendant's testimony, mere disbelief could not rise to the level of positive proof of an element sufficient to sustain plaintiff's burden). But there is more. Abbott's Mr. Gonzalez testified that Ms. Frederick told him that one of the reasons the Red Cross chose Ortho was that the HTLV rp21e test was a significant advance that soon would be available. (Perry Aff.Ex. F, at 239–41) Mr. Kloak said that he was confident that the new test would be available shortly after the start of 1994. (*Id.* at 102–03) While the evidence is hardly

overwhelming, in all the circumstances it is sufficient to raise an issue of fact.

■■ The tortious interference claim, the parties assume, is governed by New Jersey law, which in this context requires among other things proof of falsity, materiality, and causation. See, e.g., Printing Mart–Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751, 757, 563 A.2d 31, 37, 40 (1989). The preceding discussion demonstrates that Ortho is not entitled to summary judgment dismissing this claim either.

### Conclusion

For the foregoing reasons, Abbott's motion for summary judgment dismissing the complaint is granted as to the entire first claim for relief and granted as to the second through fifth claims for relief except insofar as the latter allege that Abbott tied the sale of its blood assays to the availability of its DMS, as to which it is denied. Ortho's motion for partial summary judgment dismissing the Lanham Act and tortious interference counterclaims (the first and second claims for relief) is denied.

SO ORDERED.