GREENBERG, Circuit Judge,
dissenting.
I respectfully dissent as I would reverse the district court’s order denying the motion for judgment as a matter of law on the monopolization claim but affirm on Le-Page’s’s cross-appeal from the motion *170 granting 3M a judgment as a matter of law on the attempted maintenance of monopoly claim. While I recognize that the majority opinion describes the factual background of this case, I nevertheless also will set forth its background as I believe that a more specific exposition of the facts leads to a conclusion that LePage’s’s case should not have survived 3M’s motion for a judgment as a matter of law.
As the majority indicates, 3M dominated the United States transparent tape market with a market share above 90% until the early 1990s. LePage’s around 1980 decided to sell “second brand” and private label tape, tape sold under the retailer’s, rather than the manufacturer’s name, an endeavor successful to the extent that Le-Page’s captured 88% of private label tape sales in the United States by 1992. Moreover, growth of “second brand” and private label tape accounted for a shift of some tape sales from branded tape to private label tape so the size of the private label tape business expanded. In the circumstances, not surprisingly, during the early 1990s, 3M also entered the private label tape business.
As the majority notes, LePage’s claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. In particular, it asserts that 3M devised programs that prevented LePage’s and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high. Le-Page’s barely was surviving at the time of trial and suffered large operating losses from 1996 through 1999.
This case centers on 3M’s rebate programs that, beginning in 1993, involved offers by 3M of “package” or “bundled” discounts for various items ranging from home care and leisure products to audio/visual and stationery products. Customers could earn rebates by purchasing, in addition to transparent tape, a variety of products sold by 3M's stationery division, such as Post-It Notes and packaging products. There is no doubt but that these programs created incentives for retailers to purchase more 3M products and enabled them to have single invoices, single shipments and uniform pricing programs for various 3M products. 3M linked the size of the rebates to the number of product lines in which the customers met the targets, an aggregate number that determined the rebate percentage the customer would receive on all of its 3M purchases across all product lines. Therefore, if customers failed to meet growth targets in multiple categories, they did not receive any rebate, and if they failed to meet the target in one product line, 3M reduced their rebates substantially. These requirements are at the crux of the controversy here, as Le-Page’s claims that customers could not meet these growth targets without eliminating it as a supplier of transparent tape.
In practice, as 3M’s rebate program evolved, it offered three different types of rebates: Executive Growth Fund, Partnership Growth- Fund and Brand Mix Rebates. 3M developed a “test program” called Executive Growth Fund (“EGF”) for a small number of retailers, 11 in 1993 and 15 in 1994. Under EGF, 3M negotiated volume and growth targets for each customer’s purchases from the six 3M consumer product divisions involved in the EGF program. A customer meeting the target in three or more divisions earned a volume rebate of between 0.2-1.25% of total sales.
*171 Beginning in 1995, 3M undertook to end the EGF test program and institute a rebate program called Partnership Growth Fund (“PGF”) for the same six 3M consumer products divisions. Under this program, 3M established uniform growth targets applicable to all participants. Customers who increased their purchases from at least two divisions by $1.00 and increased their total purchases by at least 12% over the previous year qualified for the rebate, which ranged from 0.5% to 2%, depending on the number of divisions (between two to five divisions) in which the customer increased its purchases and the total volume of purchases.
In 1996 and 1997, 3M offered price incentives called Brand Mix Rebates to two tape customers, Office Depot and Staples, to increase purchases of Scotch brand tapes. 3M imposed a minimum purchase level for tape set at the level of Office Depot’s and Staples’s purchases the previous year with “growth” factored in. To obtain a higher rebate, these two customers could increase their percentage of Scotch purchases relative to certain lower-priced orders.
The evidence at trial focused on the parties’ dealings with a limited number of customers and demonstrated that Le-Page’s problems were attributed to a number of factors, not merely 3M’s rebate programs. Thus, I describe this evidence at length.

Wal-Mart

Before 1992, Wal-Mart bought private label tape only from LePage’s but, in August 1992, decided to buy private label tape from 3M as well. In response, Le-Page’s lowered its prices and increased its sales to Wal-Mart. In 1997, Wal-Mart stopped buying private label tape but offered LePage’s’s branded tape as its “second tier” offering. In 1998, however, Wal-Mart told LePage’s that it was going to switch to a tape program from 3M. Le-Page’s’s president then visited Wal-Mart following which it changed its plans and retained LePage’s as a supplier. After-wards, Wal-Mart designed a test comparing LePage’s’s brand against a 3M Scotch utility tape to determine who would win Wal-Mart’s “second tier” tape business. LePage’s added more inches (approximately 20% more) to its rolls of tape and won the test. 3M continued, however, to sell Scotch brand tapes to Wal-Mart, and Le-Page’s saw its sales to Wal-Mart decline to approximately $2,000,000 annually by the time of trial. LePage’s claims that Wal-Mart cut back on its tape purchases to qualify for 3M’s bundled rebate of $1,468,835 in 1995.

Kmart

Kmart accounted for 10% of LePage’s’s annual tape sales when LePage’s lost its business to 3M in 1993. Kmart asked its suppliers, including 3M, to provide a single bid on its entire private label tape business for the following year. LePage’s’s president believed, however, that Kmart was “too lazy to make a change,” and that it would “never put their eggs in one basket” by giving all its business to 3M. LePage’s offered the same price it had offered the previous year but also offered a volume rebate. 3M offered a lower price and won the bid. Kmart asked for rebates and “market development” funds as part of the private label tape bid process. 3M offered $200,000 for promotional activities and a $300,000 volume rebate if Kmart purchased $10,000,000 of 3M’s Stationery Division products.
LePage’s claims that 3M offered Kmart $1,000,000 to eliminate LePage’s and Tesa as suppliers and to make 3M its sole tape supplier. LePage’s points to a 3M document outlining 3M’s goal for Kmart to *172 exceed $15,000,000 in 3M purchases with the reward being that Kmart would receive $75,000 in each of the first two quarters and $100,000 in the last two quarters for. promotional activities and would receive $650,000 as a volume rebate if the sales exceeded $15,000,000. If the sales were less, 3M would decrease the rebate accordingly, e.g., a $400,000 rebate for $13,000,000 of sales. LePage’s claims that, as a practical matter, Kmart had to eliminate LePage’s and Tesa to reach the growth 3M required in order to qualify for the rebate. LePage’s asserts that, despite its efforts to regain the private .label business from Kmart, one Kmart buyer told it that he could not talk to LePage’s about tape products for the next three years.

Staples

Staples had been a LePage’s customer for several years. From 1990 to 1993, LePage’s increased its sales to Staples by 440%, growing from $357,000 to $1,954,000. In 1994, Staples considered reducing suppliers and asked LePage’s and 3M for their best offers in 1994. LePage’s assumed that if 3M did make a good offer, LePage’s would have a chance to make a better proposal. LePage’s did not make its lowest offer, and 3M won the account. When LePage’s went back to Staples with a new price, it was told that the decision had been made. LePage’s claims that 3M offered an extra 1% bonus rebate on Scotch products if Staples eliminated Le-Page’s as a supplier (a “growth” rebate that only could be met by converting all of Staple’s private label business to 3M). 3M paid Staples an advertising allowance in four payments totalling $1,000,000 in 1995 and gave it $500,000 in free merchandise delivered during Staples’s fiscal year 1994. 3M refers to a “$1.5 million settlement” with Staples and refers to multiple payments for different purposes. LePage’s, however, implies that these payments bore some connection to Staples’s award of its second-tier tape business to 3M.

Office Max

In 1998, after a dispute between Office Max and LePage’s, Office Max accepted 3M’s offer that matched but did not beat LePage’s’s price. LePage’s objected to 3M’s matching whatever price LePage’s offered, and also objected to 3M’s “clout” payment. Office Max required its suppliers to make payments to help advertise the Office Max name, and LePage’s had paid this “clout” payment in the years previous to 1998 when it refused to pay it because of its dispute with Office Max. Nevertheless, the buyer for Office Max testified that its decision to give its business to 3M was not related to its pricing and rebate program but rather to the consistency of its service.

Walgreens

Walgreens had purchased private label tape from LePage’s from 1992 until 1998, when it decided to import tape from Taiwan. LePage’s’s chief executive officer acknowledged that LePage’s did not lose the account due to 3M’s activities.

American Stores

Until 1995, LePage’s’s sales of private label tape to American Stores exceeded $1,000,000 annually. According to Le-Page’s, a month after American Stores decided that it would try to maximize 3M’s PGF rebate, it shifted its tape business to 3M. In 1995, American Stores decided to stop buying LePage’s tape, principally because of quality concerns. In a letter to James Kowieski, Senior Vice President of Sales at LePage’s, Kevin Winsauer, the manager of the private label department at American, wrote: “After much deliberation comparing the pros and cons of Le- *173 Page’s program and 3M’s program, I have decided to award the business to 3M. 3M’s proposal was very competitive and I am sure LePage’s would meet their costs to retain the business. However, the decision to move to SM is 'primarily based on Quality. ” SJA 2050-51 (emphasis in original). When American Stores decided to purchase from 3M, it was not participating in any rebate programs, and Winsauer testified that he was not aware that there were rebate programs. He also testified that even without the volume incentive programs, 3M’s price was still slightly lower than LePage’s’s.

Dollar General, CVS, and Sam’s Club

LePage’s lost Dollar General’s private label business to a foreign supplier but later won the business back. According to LePage’s’s president, Dollar General used the bid for imported tape to leverage a price reduction from LePage’s. 3M bid on the CVS account, but LePage’s retained CVS as a customer by lowering its prices and increasing its rebate. At Sam’s Club, LePage’s tape had been selling well when its buyers were directed by senior management to “maximize” all purchases from 3M to maximize the EGF/PGF rebate. Subsequently, Sam’s Club stopped purchasing from LePage’s.

Other distributors and buying groups

LePage’s claimed that 3M’s pricing practices prevented or hindered it from selling private label tape to certain companies: (1) Costco. Costco, however, never has sold private label tape. (2) Office Depot. Office Depot also never has sold private label tape. LePage’s tried to convince Office Depot to buy private label tape in 1991 or 1992 (before 3M implemented the rebate programs), but Office Depot decided to continue purchasing 3M brand tape. (3) Pamida and Venture Stores. LePage’s claimed that 3M offered these stores discounts conditioned on exclusivity, thereby preventing LePage’s from selling private label tape to them. LePage’s lost Venture Stores’ business in 1989, five years before 3M provided the discount at issue. (4) Office Buying Groups. 3M offered an optional 0.3% price discount to certain buying groups if they exclusively promoted certain 3M products in their catalogs. If the buying group carried a lower value brand alternative to 3M’s main brand (its second line), then the group would receive a lower annual volume rebate. LePage’s viewed these kind of contract provisions as a “penalty” that coerced buying group members to purchase tape only from 3M. For example, if a buying group promoted the products of a competitor, it lost rebates for purchases in three categories of products. 3M argues that LePage’s could have offered its own discount or rebate but instead refused in one instance to pay the standard promotional fee charged suppliers for inclusion in a catalog.
Notwithstanding the evidence which demonstrates that LePage’s lost business for reasons that could not possibly be attributable to any unlawful conduct by 3M, it argues that 3M willfully maintained its monopoly through a “monopoly broth” of anticompetitive and predatory conduct. I would reject LePage’s’s argument as I agree with 3M that LePage’s simply did not establish that 3M’s conduct was illegal, as LePage’s did not demonstrate that 3M’s pricing was below cost (a point that is not in dispute) and, in the absence of such proof, the record does not supply any other basis on which we can uphold the judgment.
There are two elements of a monopolization claim under section 2 of the Sherman Act: “(1) the possession of monopoly power in the relevant market and (2) the *174 willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.” United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Willful maintenance involves using anticompetitive conduct to “foreclose competition, to gain a competitive advantage, or to destroy a competitor.” Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 482-83, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) (internal quotation marks omitted). LePage’s contends that 3M’s bundled rebates were anticompetitive and predatory. It also argues that 3M’s other practices, such as exclusionary contracts and the timing of its rebates, were also anticom-petitive and predatory. I discuss these claims in the order I have stated them.
LePage’s primarily complains of 3M’s use of bundled rebates. While, as the majority recognizes, we have held that rebates on volume purchases are lawful, see Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1203 (3d Cir.1995), Le-Page’s seeks to avoid that principle by pointing out that 3M offered higher rebates if customers met their garget growth rate in different product categories, in effect linking the sale of private label tape with the sale of other products, such as Scotch tape, which customers had to buy from 3M. Thus, LePage’s explains:
3M understood that, as a practical matter, every retailer in the country had to carry Scotch-brand tape.... It therefore decided to structure its rebates into bundles that linked that product with the product segment in which it did face competition from LePage’s (second-line tape).... To increase the leverage on the targeted segment, 3M further linked rebates on transparent tape with those for many other products.... The rival would have to ‘compensate’ the customer for the amount of rebate it would lose not only on the large volume of Scotch-brand tape it had to buy, but also for rebates on many other products purchased from 3M.
Br. of Appellee at 40.
In making its argument LePage’s relies in part on SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir.1978), which, as the majority notes, does not bind this en banc court but nevertheless can have prec-edential value. In SmithKline, Eh Lilly & Co. had two products, Keflin and Keflex, on which it faced no competition, and one product, Kefzol, on which it faced competition from SmithKline’s product, Ancef. See id. at 1061. Lilly offered a higher rebate of 3% to companies that purchased specified quantities of any three (which, practically speaking, meant combined purchases of Kefzol, Keflin and Keflex) of Lilly’s cephalosporin products. See id. “Although hospitals were free to purchase SmithKline’s Ancef with their Keflin and Keflex orders with Lilly, thus avoiding the penalties of a tie-in sale,[1] the practical effect of that decision would be to deny the Ancef purchaser the 3% bonus rebate on all its cephalosporin products.” Id. at 1061-62 (internal footnote added). Because of Lilly’s volume advantage, to offer a rebate of the same net dollar amount as Lilly’s, SmithKline would have had to offer *175 companies rebates ranging from 16% for average size hospitals to 35% for larger volume hospitals for their purchase of An-cef. See id. at 1062.
We concluded that Lilly willfully acquired and maintained monopoly power by linking products on which it faced no competition (Keflin and Keflex) with a competitive product, resulting in the sale of all three products on a non-competitive basis in what otherwise would have been a competitive market between Ancef and Kefzol. See id. at 1065. Moreover, this arrangement would force SmithKline to pay rebates on one product equal to rebates paid by Lilly based on sales volume of three products. See id. Expert testimony and the evidence on pricing showed that in the circumstances SmithKline’s prospects for continuing in the Ancef market were poor.
LePage’s argues that it does not have to show that 3M’s package discounts could prevent an equally efficient firm - from matching or beating 3M’s package discounts. In its brief, LePage’s contends that its expert economist explained that 3M’s programs and cash payments have the same anticompetitive impact regardless of the cost structure of the rival suppliers or their efficiency relative to that of 3M. See Br. of Appellee at 43. LePage’s alleges that the relative efficiency or cost structure of the competitor simply affects how long it would take 3M to foreclose the rival from obtaining the volume of business necessary to survive. See id. “Competition is harmed just the same by the loss of the only existing competitive constraints on 3M in a market with high entry barriers.” Id. The district court stated that LePage’s introduced substantial evidence that the anticompetitive effects of 3M’s rebate program caused its losses. See Le Page’s Inc. v. 3M, No. Civ. A. 97-3983, 2000 WL 280350, at *7-*8 (E.D.Pa. Mar.14, 2000). The majority finds that “3M’s conduct was at least as anticompeti-tive as the conduct which [we] held violated § 2 in SmithKline.” Maj. Op. at 157.
I disagree with the majority’s use of SmithKline. SmithKline showed that it could not compete by explaining how much it would have had to lower prices for both small and big customers to do so. Smith-Kline ascertained the rebates that Lilly was giving to customers on all three products and calculated how much it would have had to lower the price of its product if the rebates were all attributed to the one competitive product. In contrast, Le-Page’s did not even attempt to show that it could not compete by calculating the discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates, and thus its brief does not point to evidence along such lines.
While I recognize that it is obvious from the size of 3M’s rebates as compared to LePage’s’s sales that LePage’s would have had to make substantial reductions in prices to match the rebates 3M paid to particular customers, LePage’s did not show the amount by which it lowered its prices in actual monetary figures or by percentage to compete with 3M and how its profitability thus was decreased. Rather, LePage’s merely maintains, through the use of an expert, that it would have had to cut its prices drastically to compete and thus would have gone out of business. Furthermore, it is critically important to recognize that LePage’s had 67% of the private label business at the time of the trial. Thus, notwithstanding 3M’s rebates, LePage’s'was able to retain most of the private label business. In the circumstances, it is ironical that LePage’s complains of 3M’s use of monopoly power as the undisputed fact is that LePage’s, not 3M, was the dominant supplier of private label tape both before and after 3M initi *176 ated its rebate programs. Indeed, the record suggests that inasmuch as LePage’s could not make a profit with a 67% share of the private label sales, it must have needed to be essentially the exclusive supplier of such tape for its business to be profitable as it in fact was when it had an 88% share of the private label tape sales business.
Although I am not evaluating the expert’s method of calculating damages as I would not reach the damages issue, I emphasize that simply pointing to an expert to support the contention that the company would have gone out of business, without providing even the most basic pricing information, is insufficient. “Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.” Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 n. 19, 106 S.Ct. 1348, 1360 n. 19, 89 L.Ed.2d 538 (1986); Advo, 51 F.8d at 1198-99; Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F.Supp.2d 571, 579 (S.D.N.Y.1999) (“[A]n expert’s opinion is not a substitute for a plaintiffs obligation to provide evidence of facts that support the applicability of the expert’s opinion to the case.”), aff'd, 257 F.3d 256 (2d Cir.2001). Without such pricing information, it is difficult even to begin to estimate how much of the market share LePage’s lost was due to 3M’s bundled rebates. In fact, the evidence that I described above conclusively demonstrates that LePage’s lost private sale tape business for reasons not related to 3M’s rebates. Furthermore, some experts have questioned the validity of attributing all the rebates to the one competitive product in situations such as these.[2] I do not need, however, to decide the validity of that method of calculation, as LePage’s does not even attempt to meet that less strict test by calculating how much it would have had to lower its prices to match the rebates, even if they all were aggregated and attributed to private label tape.[3]
*177 LePage’s also has not satisfied the stricter tests devised by other courts considering bundled rebates in situations such as that here. In a case brought by a manufacturer of products used in screening blood supply for viruses, Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc., 920 F.Supp. 455 (S.D.N.Y.1996), the district court held, inter alia, that the defendant’s discount pricing of products in packages did not violate the Sherman Act. The defendant, Abbott Laboratories, manufactured all five of the commonly used tests to screen the blood supply for viruses. Ortho claimed that Abbott violated sections 1 and 2 of the Sherman Act by contracting with the Council of Community Blood Centers to give those members advantageous pricing if they purchased a package of four or five tests from Abbott, thereby using its monopoly position in some of the tests to foreclose or impair competition by Ortho in the sale of those tests available from both companies. See id. at 458. The district court stated that to prevail on a monopolization claim in “a case in which a monopolist (1) faces competition on only part of a complementary group of products, (2) offers the products both as a package and individually, and (3) effectively forces its competitors to absorb the differential between the bundled and unbundled prices of the product in which the monopolist has market power,” the plaintiff must allege and prove “either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant’s pricing makes it unprofitable for the plaintiff to continue to produce.” Id. at 469.
Holding that the discount package pricing did not violate the Sherman Act, the Ortho court explained that any other rule would involve too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price competition that would benefit consumers. See id. at 469-70 (“The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business.”) (internal quotation marks omitted).
In this case, as the majority acknowledges, LePage’s now does not contend that 3M priced its products below average variable cost, an allegation which, if made, in any event would be difficult to prove. See Advo, 51 F.3d at 1198-99. Moreover, Le-Page’s’s economist conceded that LePage’s is not as efficient a tape producer as 3M. Thus, in this case section 2 of the Sherman Act is being used to protect an inefficient producer from a competitor not using predatory pricing but rather selling above cost. While the majority contends that Brooke Group, a case on which 3M heavily relies, is distinguishable as none of the defendants there had a monopoly in the market, the fact remains that the Court in describing section 2 of the Sherman Act said flat out in Brooke Group that “a plaintiff seeking to establish competitive injury from a rival’s low prices must prove that the prices complained of are below an appropriate measure of its rival’s costs.” Brooke Group, 509 U.S. at 222, 113 S.Ct. at 2587. LePage’s simply did not do this.
I realize that the majority indicates that “LePage’s unlike the plaintiff in Brooke Group, does not make a predatory pricing *178 claim.” Maj. Op. at 151. But that circumstance weakens' rather than strengthens LePage’s’s position as it merely confirms the lawfulness of 3M’s conduct. Furthermore, the circumstance that 3M is not dealing in an oligopolistic market should not matter as the harm that LePage’s claims to have suffered from the bundled rebates would be no less if inflicted by multiple competitors. Moreover, monopolist or not, 3M, even in the absence of LePage’s and Tesa from the private label business, would not be the only supplier of private label tape for there are foreign suppliers as is demonstrated plainly by the evidence that both Walgreens and Dollar General dealt with such suppliers.
Contrary to the majority’s view, this is not a situation in which there is no business justification for 3M’s actions. This point is important inasmuch as it is difficult to distinguish legitimate competition from exclusionary conduct that harms competition, see United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C.Cir.), cert. denied, 534 U.S. 952, 122 S.Ct. 350, 151 L.Ed.2d 264 (2001), and some cases suggest that when a company acts against its economic interests and there is no valid business justification for its actions, then it is a good sign that its acts were intended to eliminate competition.
For example, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L.Ed.2d 467 (1985), discussed by the majority, sets forth the lack of a valid business reason as a basis for finding liability. In that case, the Court affirmed a jury verdict for the plaintiff under section 2 of the Sherman Act where the defendant monopolist had stopped cooperating with the plaintiff to offer a multi-venue skiing package for Aspen skiers. The Court held that because the defendant had acted contrary to its economic interests, by losing business and customers, there was no other rationale for its conduct except that it wished to eliminate the plaintiff as a competitor. See id. at 608, 105 S.Ct. at 2860; see also Eastman Kodak, 504 U.S. at 483, 112 S.Ct. at 2091 (exclusionary conduct properly is condemned if valid business reasons do not justify conduct that tends to impair the opportunities of a monopolist’s rivals or if a valid asserted purpose would be served fully by less restrictive means).
On the other hand, in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1043, 1063 (8th Cir.), cert. denied, 531 U.S. 979, 121 S.Ct. 428, 148 L.Ed.2d 436 (2000), where boat builders brought an antitrust action against a stern drive engine manufacturer, the court held, inter alia, that the evidence was insufficient to find that the engine manufacturer’s discount programs restrained trade and monopolized the market. Brunswick offered a higher percentage discount when boat builders bought a higher percentage of their enginés from it, but there was no allegation that its pricing was below cost. See id. at 1044, 1062. In Concord Boat the district court cited the district court opinion in this case when 3M filed its motion to dismiss. See LePage’s Inc. v. 3M, No. Civ. A. 97-3983, 1997 WL 734005 (E.D.Pa. Nov.14, 1997). The Concord Boat district court agreed with the plaintiff that it was not the price (above cost or not) that was relevant but the “strings” attached to the price and that the district court here was correct to distinguish Brooke Group since there were no “strings” attached (bundled rebates) in Brooke Group. In Concord Boat, the “strings” attached were the exclusivity provisions. See Concord Boat Corp. v. Brunswick Corp., 21 F.Supp.2d 923, 930 (E.D. Ark.1998).
The Court of Appeals for the Eighth Circuit, however, disagreed with the dis *179 trict court in Concord Boat The court of appeals opinion reflected an application of Brooke Group’s strong stance favoring vigorous price competition and expressing skepticism of the ability of a court to separate anticompetitive from procompetitive actions when it comes to above-cost strategic pricing. See Concord Boat, 207 F.3d at 1061. More importantly, the court perceived that Brooke Group should be considered even with claims based on pricing with strings. See id. “If a firm has discounted prices to a level that remains above the firm’s average variable cost, the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anti-competitive.” Id. (citing Morgan v. Ponder, 892 F.2d 1355, 1360 (8th Cir.1989)) (internal quotation marks omitted). The court stated that a section 2 defendant’s proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits. See id. at 1062. The court distinguished cases such as SmithKline and Ortho where products were bundled since they involved two markets. See id. Of course, here we are dealing with a single market.
Unlike the situation of the defendant in Aspen, 3M’s pricing structure and bundled rebates were not contrary to its economic interests, as they likely increased its sales. In fact, that is exactly what LePage’s is complaining about. Furthermore, other than the obvious reasons such as increasing bulk sales, market share and customer loyalty, there are several other potential “procompetitive” or valid business reasons for 3M’s pricing structure and bundled rebates: efficiency in having single invoices, single shipments and uniform pricing programs for various products. Moreover, the record demonstrates that, with the biggest customers, 3M’s rebates were not eliminating the competitive process, as LePage’s still was able to retain some customers through negotiation, and even though it lost other customers, the losses were attributable to their switching to foreign suppliers or changing suppliers because of quality or service without regard to the rebates. Furthermore, overall Le-Page’s was quite successful in holding its share of the private label sales as it had 67% of the business at the time of the trial.
In sum, I conclude that as a matter of law 3M did not violate section 2 of the Sherman Act by reason of its bundled rebates even though its practices harmed its competitors. The majority decision which upholds the contrary verdict risks curtailing price competition and a method of pricing beneficial tó customers because the bundled rebates effectively lowered their costs. I regard this result as a significant mistake which cannot be justified by a fear that somehow 3M will raise prices unreasonably later. In this regard I reiterate that in addition to LePage’s there are foreign suppliers of transparent tape so that with or without LePage’s there will be constraints on 3M’s pricing.
LePage’s also claims that, through a variety of other allegedly anticompetitive actions, 3M prevented LePage’s from competing. LePage’s asserts that 3M foreclosed competition by directly purchasing sole-supplier status. There was some dispute as to whether the contracts were conditioned on 3M being the sole supplier, and 3M claims that there are only two customers for which there is any evidence of a sole supplier agreement. I recognize, however, that although most of 3M’s contracts with customers were not conditioned on exclusivity, practically speaking some customers dropped Le-Page’s as a supplier to maximize the rebates that 3M was offering. Moreover, United Shoe Machinery Corp. v. United States, 258 U.S. 451, 458, 42 S.Ct. 363, *180 365, 66 L.Ed. 708 (1922), explained that a contract that does not contain specific agreements not to use the products of a competitor still will come within the Clayton Act as to exclusivity if its practical effect is to prevent such use.
Even assuming, however, that 3M did have exclusive contracts with some of the customers, LePage’s has not demonstrated that 3M acted illegally, as one-year exclusive contracts have been held to be reasonable and not unduly restrictive. See Fed. Trade Comm’n v. Motion Picture Adver. Serv. Co., 344 U.S. 392, 395-96, 73 S.Ct. 361, 363-64, 97 L.Ed. 426 (1953) (holding that evidence sustained the Commission’s finding that the distributor’s exclusive screening agreements with theater operators unreasonably restrained competition, but stating that the Commission had found that the term of one-year exclusive contracts had become a standard practice and would not be an undue restraint on competition). See also Advo, 51 F.3d at 1204. In Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 628, 627-28, 5 L.Ed.2d 580 (1961), the Court stated that even if in practical application a contract is found to be an exclusive-dealing arrangement, it does not violate section 3 of the Clayton Act unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Using that standard, although LePage’s’s market share in private label tape has fallen from 88% to 67%, it has not been established that, as a result of the allegedly exclusive contracts, competition was foreclosed in a substantial share of the line of commerce affected. Indeed, in view of LePage’s’s two-thirds share of the private label business, its attack on exclusivity agreements is attenuated.
There appear to be very few cases supporting liability based on section 2 of the Sherman Act for exclusive dealing, as some cases suggest that if, as is the case here under the jury’s findings, there is no liability under section 3 of the Clayton Act, it is more difficult to find liability under the Sherman Act since its scope is more restricted,[4] In any event, the record shows only two allegedly exclusive contracts (with the Venture and Pamida stores), and “[b]ecause an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function.” Microsoft, 253 F.3d at 69. The Microsoft court explained that although exclusive contracts are commonplace, particularly in the field of distribution, in certain circumstances the use of exclusive contracts may give rise to a section 2 violation even though the contracts foreclose less than the roughly 40 to 50% share usually required to establish a section 1 violation. See id. at 69-70. In this case, it cannot be concluded that the two contracts with Venture and Pamida were responsible for the total drop in LePage’s’s market share. Furthermore, even if all 3M’s contracts were considered exclusive, LePage’s’s total drop in market share was only 21%, and some of this loss was shown in the record to be due to quality or service consistency concerns, as well as foreign competition, rather than to 3M’s tactics. Therefore, there was not enough foreclosure of the market to have an anti-competitive effect.
LePage’s also claims that by calculating the rebates only once a year, 3M made it *181 more difficult for a purchaser to pass on the savings to its customers, thereby making it harder for companies to switch suppliers and keeping retail prices and margins high. As I discussed above, one-year contracts may be considered standard, and even if they make it more unlikely that rebates are passed on in the form of lower retail prices, the discounts could be applied towards lowering retail prices the following year or towards other costs by companies that are factored into the retail prices (such as advertising). In the circumstances, I am satisfied that this conduct does not qualify as predatory or anticom-petitive so as to establish liability under section 2 of the Sherman Act.
LePage’s also alleges that 3M entered the retail private label tape portion of the market to destroy the market and thereby increase its sales of branded tape, but the case law does not support liability under section 2 for this type of action. In Brooke Group, 509 U.S. at 215, 113 S.Ct. at 2584, Liggett/Brooke Group alleged that Brown & Williamson Tobacco Corporation (“B & W”) sold generic cigarettes in order to decrease losses of sales in its branded cigarettes. B & W sold generic cigarettes at the same list price as Liggett but also offered large volume rebates to certain wholesalers so they would buy their generic cigarettes from B & W. See id. at 216, 113 S.Ct. at 2584. B & W wanted to take a larger part of the generic market from Liggett and drive Liggett to raise prices on generic cigarettes, which B & W would match, thereby encouraging consumers to switch back to branded cigarettes. See id. at 216-17, 113 S.Ct. at 2584. The Court held that because B & W had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition that antitrust laws prohibit, it did not violate the Robinson-Patman Act or the Sherman Act. See id. at 243, 113 S.Ct. at 2598. In this case, however, 3M did not use below average variable cost pricing (LePage’s does not charge predatory pricing) and therefore 3M did not have predatory costs to recoup.
I recognize that LePage’s attempts to distinguish Brooke Group on the ground that “3M used other techniques lie., techniques other than predatory pricing] to extinguish the private-label category subjecting itself to different legal standards,” Br. of Appellee at 55, but I nevertheless cannot accept LePage’s’s argument on this point. While LePage’s does not contend that 3M engaged in predatory pricing, it does contend that the goal of 3M’s other conduct was “to extinguish the private-label category, subjecting itself to different legal standards” than those applicable in Brooke Group. See id. Moreover, though 3M denies that it was attempting to eliminate the private label category of transparent tape, the record supports a finding that it had that intent. I am satisfied, however, that its efforts to eliminate the private label aspect of the transparent tape market are not unlawful as, “examined without reference to its effects on competitors,” it is evident that in view of 3M’s dominance in brand tape, that it was rational for it to want the sale of tape to be concentrated in that category of the market. See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 523 (5th Cir. 1999). Thus, we should not uphold the verdict on that basis.
Accordingly, I conclude that 3M’s actions in the record, including the bundled rebates and other elements of the “monopoly broth,” were not anticompetitive and predatory as to violate section 2 of the Sherman Act.[5] Thus, I would reverse the *182 judgment of the district court and remand the case for entry of judgment in favor of 3M. Judge Scirica and Judge Alito join in this opinion.

. 3M also avoids the penalties of a tie-in sale, because its customers were free to purchase its Scotch tape by itself. To prove an illegal tie-in, a plaintiff must establish that the agreement to sell one product was conditioned on the purchase of a different or tied product; the seller "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected.” Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

. One court has mentioned a hypothetical situation where a low-cost shampoo maker could not match a competitor's package discount for shampoo and conditioner even though both products were priced above their respective costs. See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc., 920 F.Supp. 455, 467 (S.D.N.Y.1996). In that case, the court suggested that the bundled price could be unlawful under section 2 even though neither item in the package was priced below cost. If the entire package discount were attributed to the one product where the two parties compete, the low-cost shampoo maker could not lower its prices on the product enough to match the total discount without selling below its cost. See id. at 467-69. Commentators, however, suggests that this analysis is incorrect. See III Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Application ¶ 749, at 467 n.6 (rev. ed.1996).
One aspect of this method of calculation worth noting is that the volume of the products ordered has a drastic effect on how much the competitor would have to lower its prices to compete. For example, suppose in a similar rebate program, a company was the only producer of products A and B but faced competition in C. If a customer orders 100 units each of A, B, and C at a price of $1.00 each, a 3% rebate would be $9.00 (3% of the total of $300.00). If the rebate on all three products were attributed to product C, then the competitor would have to lower its price to $0.91 in order to compete with it. The results would be starkly different, however, if a customer orders 100 units of A and B but only needs 10 units of C. Then the 3% rebate on the total purchase amount of $210.00 would be $6.30. If the rebate was attributed solely to product C, then a competitor would have to lower its price to $.37 on product C in order to match the company's price.

. The closest LePage's comes to supplying such information in its brief is its statement that ''LePage’s made repeated efforts to save *177 its tape business with Staples, reducing its prices to 1990 levels, and then reducing them again, to keep its plant open and people working.” Br. of Appellee at 11. This is not close enough. Of course, Lepage’s's prices overall were low enough for it to have 67% of the private label business.

. It is more common for charges of exclusive dealing to be brought under section 1 of the Sherman Act or the Clayton Act, which the jury found that 3M did not violate. See, e.g., Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir.1992).

. While I do not discuss the point I agree with the district court's disposition of the attempt *182 ed maintenance of monopoly claim.